**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| HEALTHY GULF,<br>P.O. Box 2245<br>New Orleans, LA 70176 | No. _____ |
| TURTLE ISLAND RESTORATION<br>NETWORK<br>PO Box 370<br>Forest Knolls CA 94933 | COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |
|                    Plaintiffs, | |
|      v. | |
| NATIONAL MARINE FISHERIES SERVICE<br>Room 14555<br>1315 East-West Highway<br>Silver Spring, Montgomery County, MD 20910 | |
| NATIONAL OCEANIC AND ATMOSPHERIC<br>ADMINISTRATION<br>1315 East-West Highway<br>Silver Spring, Montgomery County, MD 20910, | |
| WILBUR L. ROSS, in his official capacity as<br>Secretary of the Department of Commerce<br>Department of Commerce<br>1401 Constitution Avenue, NW<br>Washington, D.C. 20230 | |
|                  Defendants. | |

## INTRODUCTION

1.     Plaintiffs Healthy Gulf and Turtle Island Restoration Network bring this case to

remedy violations of the Magnuson-Stevens Fishery Conservation and Management Act

("Magnuson-Stevens Act"), the Atlantic Tunas Convention Act ("ATCA"), National

Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA") by the

National Marine Fisheries Service, the National Oceanic and Atmospheric Administration, and

the Department of Commerce (hereinafter, "NMFS" or "Defendants"). The violations arise out of NMFS's decision to eliminate management measures that are legally required and biologically essential to conserving and rebuilding the Western Atlantic bluefin tuna ("bluefin") population to pelagic longline fishing gear. NMFS's decision violates its fundamental duties to prevent and end overfishing through management measures based on the best available science, to enact measures necessary to protect bluefin in accordance with international treaty obligations, and to seriously consider the effects of allowing increased incidental catch ("bycatch") and death of reproductive adult bluefin during their peak spawning season on the already struggling bluefin population.

2.      Specifically, Plaintiffs challenge a final rule that NMFS promulgated on April 2, 2020, which, among other things, removed restrictions on the use of pelagic longline fishing gear in two areas the agency knows to be important to bluefin and where pelagic longline fishing results in unsustainable bycatch of bluefin: the Spring Gulf of Mexico Gear Restricted Area ("Gulf GRA") and the Northeastern United States Closed Area. 85 Fed. Reg. 18812 (hereinafter, "Bluefin Bycatch Rule"). NMFS's decision to remove measures that are essential to conserving and rebuilding the bluefin population stands in glaring contrast to the agency's own data and experience, and violates its fundamental duties under both domestic law and international treaty obligations.

3.      NMFS's decision to reopen the Gulf GRA to pelagic longline fishing threatens the very foundation of the bluefin population. NMFS implemented the Gulf GRA to protect the Western Atlantic bluefin tuna's only known spawning grounds. Reproductive adult bluefin tuna congregate in the Gulf of Mexico each spring to spawn, with peak spawning occurring in April and May. Catching and killing spawning bluefin harms the population by removing vital,

reproductive adults and preventing those fish from contributing to the population. For that very reason, the treaty governing Atlantic bluefin tuna management, the International Convention for the Conservation of Atlantic Tunas ("ICCAT"), has directed NMFS to prohibit fishing for bluefin tuna in the Gulf of Mexico since 1982.

4.      For several decades, NMFS prohibited pelagic longline vessels from engaging in intentional or targeted fishing for bluefin in the Gulf of Mexico but nonetheless allowed those vessels to retain a limited number bluefin caught as bycatch. Bluefin tuna is a prized fish in the high-end sushi market, with individual fish selling for tens of thousands of dollars. As a result, despite the prohibition on targeted fishing for spawning bluefin, a *de facto* fishery developed in the Gulf, with pelagic longline vessels fishing on spawning aggregations so that they could "incidentally" catch and sell bluefin tuna. Overfishing of bluefin continued and the population continued to languish at diminished levels.

5.      NMFS finally put an end to this practice when it implemented the Gulf GRA in 2015. In just three years, the Gulf GRA reduced deaths of bluefin tuna in the Gulf of Mexico by 70 percent, giving bluefin a chance to finally recover.

6.      On the heels of this resounding success, NMFS promulgated the Bluefin Bycatch Rule, touting its interest in eliminating what it deemed potentially "redundant" or "burdensome" regulations. Despite decades of evidence showing that simply limiting the number of "incidentally" caught bluefin a vessel can keep fails to protect critically valuable spawning bluefin, NMFS removed the Gulf GRA prohibitions on pelagic longlining in bluefin spawning grounds during peak spawning season. Instead, the agency proposes to "monitor" how many bluefin are caught in the area against generous catch allowances. Nowhere in the Bluefin Bycatch Rule or the environmental impact statement underlying it does NMFS address the

known, inevitable harm to the bluefin population caused by allowing increased catch and death of spawning bluefin.

7.    The Bluefin Bycatch Rule similarly removed prohibitions on pelagic longline fishing during June of each year in the Northeastern United States Closed Area—an area NMFS closed in 1998 in compliance with ICCAT recommendations to minimize bluefin bycatch and mortality in the pelagic longline fishery.

8.    NMFS removed these proven conservation and management measures without any meaningful analysis of how it would affect the bluefin population. Nor did NMFS analyze how opening these areas to pelagic longline gear would affect other non-target or bycatch species, even though its own data plainly show pelagic longline gear catches, injures, and kills thousands of individuals from dozens of others species. These species include threatened and endangered animals, such as leatherback and loggerhead sea turtles and oceanic whitetip sharks, as well as other overfished fish species, such as white marlin, blue marlin, and bigeye tuna.

9.    The Bluefin Bycatch Rule violates multiple legal requirements. It violates NMFS's duties under the Magnuson-Stevens Act to base its decisions on the best available science and ensure that its management measures prevent or end overfishing and ensure timely rebuilding of the bluefin population. It also violates NMFS's obligations under ATCA to promulgate regulations that carry out ICCAT's recommendations, including recommendations aimed at protecting bluefin tuna from being targeted—officially or unofficially—by pelagic longline vessels. NMFS has also violated NEPA's core requirement to take a hard look at the effects of the Bluefin Bycatch Rule on the bluefin population as well as the populations of numerous other species, including species protected under the Endangered Species Act. NMFS's action further violates the APA's requirement to draw a rational connection between its decision

and the facts in front of it, and to offer a reasonable explanation for changing its position and removing the carefully crafted Gulf GRA after its own data proved the measure successful. Finally, NMFS violated basic APA rulemaking procedures by making the Bluefin Bycatch Rule effective the same day it published the rule. NMFS's actions and failures to act have harmed Plaintiffs' members' interests in rebuilding and maintaining a healthy and sustainable population of bluefin tuna, and in protecting numerous other species such as sea turtles, sharks, and marine mammals from increased harm caused by pelagic longline fishing. This harm will continue in the absence of action by the Court.

## JURISDICTION AND VENUE

10.     This action arises under the Magnuson-Stevens Act, 16 U.S.C. §§ 1801–1891d; the Atlantic Tunas Convention Act, 16 U.S.C. §§ 971–971k; NEPA, 42 U.S.C. §§ 4321–4370h; and the APA, 5 U.S.C. §§ 701–706.

11.     This Court has jurisdiction over this action pursuant to the Magnuson-Stevens Act, which provides that "[t]he district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the Magnuson-Stevens Act. 16 U.S.C. §1861(d). The Magnuson-Stevens Act also provides that actions taken by the Secretary of Commerce under regulations implementing a fishery management plan shall be subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." 16 U.S.C. § 1855(f). Defendants published the final rule implementing measures on April 2, 2020, in the Federal Register. 85 Fed. Reg. 18812. Plaintiffs Healthy Gulf and Turtle Island Restoration Network are filing this Complaint within thirty (30) days of publication of the Bluefin Bycatch Rule.

12.     This Court further has jurisdiction over this action pursuant to the APA, 5 U.S.C. §§ 701–706, which provides that final agency action for which there is no other remedy in a court is subject to judicial review; 28 U.S.C. § 1331 (federal question jurisdiction), which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States;" and 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

13.     This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and may grant relief pursuant to the Magnuson-Stevens Act, 16 U.S.C. § 1861(d), 1855(f), as well as the APA, 5 U.S.C. § 706. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

14.     Venue is properly vested in this judicial district under 28 U.S.C. § 1391(b), (e), where the Defendants are officers or employees of the United States and reside in this district, and a substantial part of the events and omissions which gave rise to this action occurred in this district.

## PARTIES

15.     Plaintiff HEALTHY GULF is a 26-year-old non-profit organization, representing thousands of members and supporters, focused on empowering people to protect and restore the natural resources of the Gulf of Mexico region. Healthy Gulf has been actively involved in efforts to protect and restore marine wildlife by reducing the unintended catch of marine creatures (bluefin tuna, turtles, dolphins, and sharks) in fishing gear. Healthy Gulf and its members have long been concerned about the protection of bluefin tuna in the Gulf of Mexico. They have a deep interest in conserving bluefin tuna because of the role they play in the

ecosystem in the Gulf of Mexico, their natural beauty, and the opportunity to interact with them in the wild. In 2013 and 2014, Healthy Gulf and its supporters were actively engaged in encouraging NMFS to establish the Gulf Gear Restricted Area as part of Amendment 7, including attending and commenting at a public hearing about it in Louisiana, submitting organizational comments, and sending messages from hundreds of Healthy Gulf supporters to NMFS. Healthy Gulf has offices in New Orleans, Louisiana; Pensacola, Florida; and Madison, Mississippi. Healthy Gulf's members are located throughout the United States, and regularly use the ocean waters and coastal areas throughout the Gulf of Mexico, as well as along the Atlantic coast, for activities including fishing, boating, photography, wildlife watching. Healthy Gulf brings this action on behalf of itself and its adversely affected members.

16.     Plaintiff TURTLE ISLAND RESTORATION NETWORK ("TIRN") is a non-profit corporation with a Gulf of Mexico office in Galveston, Texas. TIRN is an environmental organization that has been the leading advocate for the world's oceans and marine wildlife. TIRN and its members work to protect and restore populations of endangered sea turtles and other vulnerable marine creatures such as whales and dolphins through protecting marine biodiversity on the Texas coast and throughout the Gulf of Mexico. TIRN and its members have a vested interest in securing a future for vulnerable sea creatures and preventing their extinction. TIRN does so in part by ensuring such creatures do not end up as "bycatch" in non-target fisheries, such as the pelagic longline fishery, which historically is associated with extremely high levels of bycatch. TIRN also has a vested interest in seeing the continued survival of bluefin tuna in the Gulf of Mexico, an iconic species that is an integral part of a healthy marine ecosystem. TIRN and its members are concerned that the bluefin tuna population has suffered a tremendous loss over the last few decades and without attention and enforced regulations, could

plummet to dangerously low levels. In addition, TIRN and its members have an interest in protecting other species that care caught as bycatch and placed at risk of increased harm due to the Bluefin Bycatch Rule, including sea turtles, dolphins, and whales. These species play a role in the greater food web, and all are important for a healthy ecosystem and Gulf. TIRN's members and staff study, visit, observe, and photograph marine wildlife and habitats in the Gulf on a regular, ongoing basis and intend to continue to do so in the future. TIRN brings this action on behalf of itself and its adversely affected members.

17.    Defendant NATIONAL MARINE FISHERIES SERVICE ("NMFS") is an agency of the United States Department of Commerce that has been delegated the responsibility to implement and enforce fishery management plans and amendments to those plans, and to issue implementing regulations. NMFS is the United States government agency with primary responsibility to ensure that the requirements of the Magnuson-Stevens Act and ATCA are followed and enforced, including the requirements to implement actions necessary to end overfishing and rebuild overfished populations of fish, and promulgate regulations necessary to implement ICCAT recommendations.

18.    Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION ("NOAA") is an agency of the United States Department of Commerce. The Secretary has delegated responsibility to implement and enforce compliance with the Magnuson-Stevens Act and ATCA to NOAA, which in turn has sub-delegated that responsibility to NMFS.

19.    Defendant WILBUR L. ROSS is Secretary of the United States Department of Commerce ("Secretary"). He is sued in his official capacity as the chief officer of the Department of Commerce, which is charged with overseeing the proper administration and implementation of the Magnuson-Stevens Act, including provisions of that Act that require the

Secretary to take actions necessary to prevent and end overfishing and rebuild overfished populations of fish, and ATCA, including provisions of that Act requiring the Secretary to promulgate regulations necessary and appropriate to carry out the purposes of ICCAT and ICCAT recommendations.

## STATUTORY BACKGROUND

### I.  Magnuson-Stevens Fishery Conservation and Management Act

20.    The Magnuson-Stevens Act governs the conservation and management of fisheries in the United States territorial waters and in the exclusive economic zone, which extends from the boundaries of state waters (typically 3 miles from shore) to 200 miles offshore or to an international boundary with neighboring countries. 16 U.S.C. §§ 1801(b)(1), 1802(11). The Magnuson-Stevens Act gives the Secretary, acting through NMFS, authority to regulate fishing in federal waters.

21.    Congress enacted the Magnuson-Stevens Act "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States . . . ," "to support and encourage the implementation and enforcement of international fishery agreements for the conservation and management of highly migratory species" and "to promote domestic commercial and recreational fishing under sound conservation and management principles . . . ." 16 U.S.C. § 1801(b)(1), (2), (3).

22.    The Magnuson-Stevens Act gives NMFS authority over fisheries for Atlantic highly migratory species, 16 U.S.C. § 1852(a)(3), and requires NMFS to prepare and implement fishery management plans and amendments for all Atlantic highly migratory fisheries under its authority, *id*. § 1854(g)(1). The Magnuson-Stevens Act defines the "highly migratory species" as "tuna species, marlin (Tetrapturus spp. and Makaira spp.), oceanic sharks, sailfishes (Istiophorus spp.), and swordfish (*Xiphias gladius*)." 16 U.S.C. 1802(21). NMFS manages bluefin tuna under

its Consolidated Atlantic Highly Migratory Species Fishery Management Plan.

23.     NMFS has the responsibility to carry out any fishery management plan or plan amendment in accordance with the Magnuson-Stevens Act. 16 U.S.C. § 1855(d). The Magnuson-Stevens Act gives NMFS authority to promulgate regulations, pursuant to APA rulemaking procedures, as may be necessary to carry out fishery management plans or to carry out any other provisions of the Act, including the preeminent requirement to prevent or end overfishing. *Id*. §§ 1851(a)(1), 1855(d).

24.     The Magnuson-Stevens Act requires fishery management plans and amendments to "contain the conservation and management measures . . . necessary . . . to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853(a)(1)(A). The Act also requires fishery management plans and amendments to be "consistent with the national standards . . . [and] regulations implementing recommendations by international organizations in which the United States participates (including but not limited to closed areas, quotas, and size limits), and any other applicable law" *Id.* at § 1853(a)(1)(C).

25.     "Conservation and management measures" include "all of the rules, regulations, conditions, methods, and other measures" to "rebuild, restore, or maintain . . . the marine environment." *Id.* §§ 1802(5), 1853(a)(1).

26.     The Magnuson-Stevens Act also requires that fishery management plans, fishery management plan amendments, and any regulations promulgated to implement such fishery management plans be consistent with the "National Standards" for fishery conservation and management. 16 U.S.C. § 1851(a). Pursuant to the Magnuson-Stevens Act, 16 U.S.C. § 1851(b), NMFS has promulgated guidelines for implementing the ten national standards for fishery

conservation and management measures. The guidelines reflect NMFS's interpretation of the national standards. 50 C.F.R. § 600.305(a)(3).

27.     National Standard One of the Magnuson-Stevens Act requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1851(a)(1). The statute defines "overfishing" as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(34). "Optimum" in terms of yield from an overfished fishery, such as the bluefin fishery, is defined as the amount of fish which "provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." *Id.* § 1802(33)(C).

28.     National Standard Two of the Magnuson-Stevens Act requires NMFS to base management measures on the best scientific information available. 16 U.S.C. § 1851(a)(2).

29.     National Standard Five requires that "[c]onservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources." 16 U.S.C. § 1851(a)(5). Under the Magnuson-Stevens Act, NMFS "must give priority to conservation measures. It is only when two different plans achieve similar conservation measures that the Service takes into consideration adverse economic consequences." *Natural Res. Def. Council v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000).

30.     National Standard Nine requires that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." 16 U.S.C. § 1851(a)(9). The National Standard Nine guidelines state that bycatch may "impede efforts to protect marine ecosystems and achieve sustainable fisheries" 50 C.F.R. § 600.350(b). "Any proposed conservation and

management measure that does not give priority to avoiding the capture of bycatch species must be supported by appropriate analyses." *Id.* at 600.350(d).

31.     Within two years of determining that a stock is overfished or approaching a condition of being overfished, NMFS must implement a fishery management plan, fishery management plan amendment, or proposed regulation "to end overfishing immediately in the fishery and to rebuild affected stocks of fish." 16 U.S.C. § 1854(e)(3)(A); 50 C.F.R. § 600.310(j)(2)(ii). This plan, amendment, or regulation (often called a "rebuilding plan") must specify a time for rebuilding the population that must be "as short as possible," taking into account, among other things, the status and biology of the overfished species and recommendations by international organizations in which the United States participates. 16 U.S.C. § 1854(e)(4)(A)(i). The Act specifies that the rebuilding period may not exceed 10 years, unless the biology of the stock, other environmental conditions, or management measures under an international agreement dictate otherwise. *Id.* § 1854(e)(4)(A)(ii).

32.     The Magnuson-Stevens Act requires NMFS to review each rebuilding plan at least every two years to determine whether it has resulted in adequate progress toward ending overfishing and rebuilding the affected fish stock. 16 U.S.C. § 1854(e)(7). If a rebuilding plan for an Atlantic highly migratory species such as Atlantic bluefin tuna has not achieved adequate progress, NMFS must immediately make revisions necessary to achieve adequate progress. *Id*. § 1854(e)(7)(A).

**II.     Atlantic Tunas Convention Act**

33.     The International Commission for the Conservation of Atlantic Tunas "oversees the conservation and management of a variety of Atlantic marine species, including tunas, swordfish, marlin and sharks, and adopts measures to minimize bycatch of turtles and seabirds

associated with these fisheries." ICCAT consists of over 40 contracting parties including the U.S., Canada, the European Community, Japan, and China. ICCAT requires member countries to collect catch data and recommends quotas for fish allocated to each member nation.

34.     NMFS implements ICCAT management measures with respect to U.S. fishermen through its authority under the Atlantic Tunas Convention Act. ATCA authorizes and directs NMFS to adopt regulations that are necessary to carry out the purposes and objectives of the ICCAT and ATCA, 16 U.S.C. § 971d(a). In addition, ATCA requires NMFS to promulgate regulations necessary and appropriate to carry out approved ICCAT recommendations. *Id*. § 971d(c)(1)(A).

35.     Under ATCA, NMFS is authorized to "establish one or more open or closed seasons as to each such area," *id.* § 971d(c)(3)(C), as well as "prohibit the incidental catch of a regulated species," *id.* § 971d(c)(3)(E). ATCA prohibits NMFS from taking an action that "may have the effect of increasing or decreasing any allocation or quota of fish or fishing mortality level" set by ICCAT. *Id.* § 971d(c)(3).

## III.    National Environmental Policy Act

36.     NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purpose is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. Regulations promulgated by the Council on Environmental Quality ("CEQ") implement NEPA and govern NMFS's decision-making. *See* 40 C.F.R. §§ 1500–1508; 33 C.F.R. Part 230.

37.     Congress enacted NEPA to require federal agencies to incorporate environmental concerns into the decision-making process. 42 U.S.C. § 4331(a)–(b). In furtherance of this goal, NEPA compels federal agencies to evaluate prospectively the environmental impacts of

proposed actions that they carry out, fund, or authorize and to ensure that the public is given a meaningful opportunity to participate in the decision-making process.

38.     NEPA requires federal agencies to fully consider and disclose the environmental consequences of an agency action before proceeding with that action—to take a "hard look." 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1501.4. An agency's evaluation of environmental consequences must be based on "accurate scientific" information of "high quality." 40 C.F.R. § 1500.1(b), 1502.24.

39.     NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. The EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

40.     In an EIS, the federal agency must identify the direct, indirect, and cumulative impacts of the proposed action, consider alternative actions and their impacts, and identify all irreversible and irretrievable commitments of resources associated with the proposed action. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1502.14.

41.     NEPA requires agencies to consider "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii), (E); 40 C.F.R. § 1508.25. The analysis of alternatives is the "heart" of the NEPA process and must provide "a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

42.     CEQ regulations require federal agencies "to the fullest extent possible," to "[u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will

avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. §§ 1500.2, 1500.2(e).

43.     NEPA requires that an agency incorporate its environmental analysis into its decision-making process. "NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action." 40 C.F.R. § 1500.1(c); *see also id.* ("Ultimately . . . it is not better documents but better decisions that count."); *id.* § 1502.1 ("primary purpose" of an EIS is to "serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. . . . An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.").

## IV.    Administrative Procedure Act

44.     The APA sets forth basic requirements for federal rulemaking processes, including public notice and opportunity to comment on a proposed rule and required timelines for making a final rule effective. 5 U.S.C. § 553(b)–(d). The APA specifies that publication of a final rule "shall be made not less than 30 days before its effective date," unless the agency demonstrates that "good cause" exists to waive that requirement. *Id.* at § 553(d).

45.     The APA grants a right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

46.     Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co.*,

463 U.S. 29, 43 (1983).

47.    Under the APA, a court must also "hold unlawful and set aside" any agency

action taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right" or "unsupported by substantial evidence" 5 U.S.C. § 706(2)(C), (E).

48.    NMFS's promulgation of the Bluefin Bycatch Rule removing restrictions on the

use of pelagic longline gear in the Gulf GRA and Northeastern United States Closed Area is a

"final agency action" subject to judicial review under the APA. *Id.* at § 704.

49.    The APA requires NMFS to consider all relevant factors and draw a rational

connection between the facts in the record and its decisions in the Bluefin Bycatch Rule.

## STATEMENT OF FACTS

### Biology and Status of Western Atlantic Bluefin Tuna

50.    Bluefin tuna are top predators that can reach nearly 10 feet in length and weigh as

much as 1,500 pounds. Bluefin tuna have a torpedo-like shape and possess a specialized

musculature that enables them to retract their pectoral fins into slots along their bodies during

high-speed acceleration. Bluefin can swim at speeds of 35 miles per hour.

51.    Two populations of bluefin tuna live in and are targeted by fisheries in the

Atlantic Ocean: Western and Eastern.

52.    Western Atlantic bluefin tuna spend a large part of the year feeding in temperate

waters and migrate thousands of miles across national waters and the high seas to return to

warmer waters in the Gulf of Mexico. The Gulf of Mexico is the primary spawning ground for

bluefin caught in the west. Bluefin annually spawn during the months of March through June,

with peak spawning in April and May. Juveniles spend much of their early years foraging off the

east coast of the United States and Canada. Adult bluefin also forage in these areas when they are not in the Gulf of Mexico to spawn.

53.    Bluefin tuna are highly prized for use in sushi and can sell for tens of thousands of dollars per individual fish, making them a highly lucrative species to catch and sell. As a result, bluefin tuna suffer unsustainable fishing pressure from fishing fleets around the globe.

54.    Bluefin are also caught as bycatch in fisheries targeting other tuna species and swordfish. While NMFS has prohibited U.S. pelagic longline vessels from targeting bluefin since 1981, significant numbers of bluefin are still caught and killed as bycatch in the pelagic longline fishery. Pelagic longline vessels use a primary fishing line, or mainline, that can vary from 5 to 40 miles in length with approximately 20 to 30 hooks per mile. Approximately 59 percent of bluefin caught by pelagic longline gear in the Gulf of Mexico are either dead by the time they are hauled back to the vessel or subsequently die after release due to their injuries.

55.    Since 1950, the Western Atlantic bluefin population has declined by more than 80 percent and remains severely diminished. Stock assessment models estimate the population is between only 45 to 69 percent of its already diminished 1974 level.

56.    In 1997, NMFS determined that the Western Atlantic bluefin tuna population was overfished. In 1998, ICCAT issued recommendations as part of a rebuilding program, including recommendations directing parties to minimize dead discards of bluefin tuna. Based on that recommendation, NMFS implemented the Northeastern United States Closed Area to reduce bluefin tuna discards in the pelagic longline fishery. 64 Fed. Reg. 29090, 29130 (May 28, 1999). The Northeastern United States Closed Area, located off the coast of New Jersey, was closed to pelagic longline fishing from June 1 through June 30 each year. NMFS designed the closure based in part on an analysis that showed prohibiting pelagic longlining in this area during the

month of June could reduce bluefin tuna discards by 55 percent without substantially negatively affecting target catch levels or bycatch of other species.

57.    NMFS data suggest that reopening the Northeastern United States Closed Area could result in a sizeable increase in bluefin mortality. A comparison of data on bluefin landings (i.e. number of bluefin caught and kept, released alive, and discarded dead) inside the closure in 1996–1997 with landings in the area surrounding the closure in 2015–2018 revealed an 82 percent decrease (440 to 78) in the number of bluefin discarded dead during the month of June. Total bluefin mortality (the total number of bluefin caught and kept and discarded dead) in this area decreased from 694 in 1996–1997 to 388 in 2015–2018 (approximately a 56 percent reduction).

58.    ICCAT initiated a rebuilding plan for bluefin tuna in 1998 that was supposed to rebuild the population by 2018. Due to alleged uncertainties in relevant data, ICCAT has not made a determination whether the population has achieved rebuilding goals, and instead abandoned the rebuilding target and plan in 2017.

59.    In 2017, ICCAT's Standing Committee on Research and Statistics predicted that the current level of catch allowed for the Western Atlantic population would lead to further population decline for the foreseeable future, with an approximately 8 percent decline expected by 2020. An updated assessment is scheduled to be completed in late 2020.

### Protecting Spawning Bluefin Tuna Is Essential to Maintaining and Rebuilding the Population

60.    Fish species regularly spawn in specific spots in order to maximize the survival of offspring and thus propagation of their genes. Spawning sites are often areas that are highly productive, allowing the larvae to feed and increase chances of survival in the ocean. Catching fish during peak spawning interrupts the species' ability to reproduce and thus to maintain and

rebuild its population.

61.     The Gulf of Mexico is the only known, major spawning ground for the Western

Atlantic bluefin tuna. Every bluefin tuna caught in those waters is a reproductively vital member

of the Western Atlantic population that has come there to spawn. Bluefin form spawning

aggregations—predictable gatherings of adult fish for the purpose of spawning. While these

aggregations facilitate reproduction, they also make the fish much easier to find and catch.

62.     NMFS and ICCAT have recognized the importance of protecting bluefin

spawning grounds and spawning bluefin tuna for four decades.

63.     In 1982, ICCAT recommended that no directed fishing for bluefin be allowed to

take place in the Gulf of Mexico. The purpose of this recommendation was to prevent mortality

of spawning bluefin. In 2011, ICCAT further acknowledged the importance of spawning to

rebuilding the population when the ICCAT Standing Committee on Research and Statistics

recommended protecting the large 2003 year class of bluefin tuna (i.e. the fish spawned in 2003),

which was approaching reproductive maturity and expected to enter the Gulf of Mexico to spawn

for the first time.

64.     In 2017, ICCAT adopted an interim conservation and management plan for

bluefin to transition from the rebuilding plan to a long-term management strategy. The plan

reiterated "[t]here shall be no directed fishery on the bluefin tuna spawning stock in the Western

Atlantic spawning grounds (i.e., the Gulf of Mexico)." Recommendation by ICCAT for an

Interim Conservation and Management Plan for Western Atlantic Bluefin Tuna, 17-06, Rec. #12

(Nov. 2017).

65.     Since the early 1980s, NMFS has also recognized that the Gulf of Mexico pelagic

longline fishery kills significant numbers of spawning adult bluefin.

66.      In 1981, due to concerns about increased targeting in the Gulf of Mexico spawning ground, NMFS promulgated an amendment to prohibit longlines in a directed fishery for Atlantic bluefin in order to reduce bycatch and "stay within U.S. commitments to the Atlantic Tunas Convention Act". 46 Fed. Reg. 8012, 8012 (Jan. 26, 1981).

67.      Notwithstanding that recognition, NMFS established an "incidental catch" limit to allow fishermen to retain some "non-targeted" bluefin. *Id.* at 8013–14.

68.      In 1982, NMFS significantly reduced the quota for incidentally caught bluefin for the Gulf, expressing concern that the bluefin being killed with longline gear in the Gulf "are spawning adults" and that "minimizing their capture, therefore, may contribute to increasing stock size." 47 Fed. Reg. 17086, 17089 (Apr. 21, 1982).

69.      During the late 1980s and 1990s, commercial demand for bluefin spiked and the price of these fish skyrocketed. In 1988, NMFS recognized that allowing commercial fishermen to retain "incidentally" caught bluefin tuna "may have permitted a directed fishery for Atlantic bluefin tuna in the Gulf of Mexico, contrary to the intent of the regulations and the United States' obligations" to ICCAT. 53 Fed. Reg. 10415, 10415 (Mar. 31, 1988). Accordingly, NMFS sought comments on whether to "close all or a portion of the Gulf of Mexico to longline gear during a specified spawning season." *Id*.

70.      Throughout the 1990s, ICCAT continued to recommend measures to prevent further declines in the Western Atlantic bluefin tuna stock. In 1998, ICCAT recommended a 20-year Rebuilding Program for Western Atlantic Bluefin Tuna (Rec. 98–07), prohibiting directed fishing on spawning bluefin in the Gulf of Mexico and requiring that all Contracting Parties minimize dead discards of bluefin tuna to the extent practicable.

71.      NMFS established the Gulf GRA in 2014, through Amendment 7 to the 2006

Consolidated Atlantic Highly Migratory Species Fishery Management Plan (79 Fed. Reg. 71510 (Dec. 2, 2014)) ("Amendment 7").

72.     Under Amendment 7, NMFS prohibited the use of pelagic longline gear in the Gulf GRA, which consists of two areas in the central and eastern Gulf of Mexico where NMFS found the highest bluefin bycatch rates, from April 1 through May 31 annually, during the peak of the spawning season. In establishing the Gulf GRA, NMFS concluded that because bluefin tuna in the Gulf of Mexico are comprised of large fish that are sexually mature and likely to be spawning, reducing bluefin bycatch in pelagic longline gear in the Gulf of Mexico would likely also enhance spawning potential and stock growth.

73.     The implementation of the Gulf GRA resulted in a substantial drop in bluefin tuna bycatch and dead discards in the pelagic longline fishery. Average annual bluefin tuna bycatch numbers during the April and May closure months were 82 percent lower in 2015 and 2016 than they were in 2006 through 2012, before the Gulf GRA was in place. Overall, the Gulf GRA contributed substantially to a 70 percent reduction in bluefin bycatch in the Gulf of Mexico spawning grounds and a 95 percent reduction in dead discards of bluefin tuna since its implementation.

**The 2020 Bluefin Bycatch Rule**

74.     Notwithstanding Amendment 7's success, on March 2, 2018, NMFS initiated a scoping process and draft environmental impact analysis "to determine if existing area-based and weak hook management measures are the best means of achieving the current management objectives and providing flexibility to adapt to fishing variability in the future." 83 Fed. Reg. 8969, 8969 (Mar. 2, 2018).

75.     NMFS published a Draft Environmental Impact Statement, 84 Fed. Reg. 22492

(May 17, 2019), and a proposed rule, 84 Fed. Reg. 33205 (July 12, 2019), that identified and analyzed 14 alternatives that would either retain, modify, or remove certain existing management measures, including the Northeastern United States Closed Area, Cape Hatteras Gear Restricted Area, Spring Gulf of Mexico Gear Restricted Area, and Gulf of Mexico weak hook requirements. In January 2020, NMFS published a Final Environmental Impact Statement ("FEIS"). On March 30, 2020, the Assistant Administrator for NOAA signed a Record of Decision adopting these measures.

76.     NMFS published the final Bluefin Bycatch Rule on April 2, 2020 with the central objective of "reducing redundancies in regulations." In pursuit of that objective, NMFS stated it will "undertake a review process to collect and review data to evaluate the continued need for the Northeastern United States Closed Area and the Spring Gulf of Mexico Gear Restricted Area." 85 Fed. Reg. 18812, 18812. Among other things, the Bluefin Bycatch Rule removes prohibitions on the use of pelagic longline gear in the Gulf GRA and Northeastern United States Closed Area. The rule purports to convert these previously closed areas to "monitoring areas." NMFS states that it will monitor the number of bluefin caught in the previously closed areas and compare that catch to generous catch thresholds for each area to evaluate whether these areas "are not needed or whether they continue to be needed in addition to the IBQ." *Id.* at 18815. The "IBQ" refers to the "incidental bluefin quota" program, which limits the number of "incidentally" caught bluefin each vessel may retain for sale.

77.     Despite NMFS's claim that it will use catch information to evaluate the need for the Gulf GRA and Northeastern United States Closed Area, the rule does not establish any additional monitoring or data collection requirements in these areas (e.g., increased observer coverage, increased audit of electronic monitoring footage, etc.). It also fails to establish or

include any scientific research methodology as part of this "evaluation," even though in 2019 NMFS initiated a separate rulemaking process to develop a scientific research approach examining whether changes to these same closed areas are appropriate.

78.     In justifying the Bluefin Bycatch Rule, NMFS asserted that the substantial reductions in total bluefin bycatch achieved in recent years could be attributed to incentives to avoid bluefin tuna inherent in the IBQ Program. Yet, a comparison of the reductions in bycatch and mortality during periods when only the IBQ program was in effect to periods when the Gulf GRA was also in effect show that the Gulf GRA resulted in substantial additional reductions. NMFS admitted in the FEIS that "the percent reduction in total interactions, mortality, discards and dead discards was greater in April-May than in February-March[]," when pelagic longline fishing was prohibited within the Gulf GRA. In fact, NMFS's own analysis showed that bluefin mortality decreased by 81 to 88 percent while the Gulf GRA was in effect in April and May, compared to reductions of 11 to 68 percent in other months. Because the majority of bluefin caught on pelagic longlines die by the time they are hauled to the fishing vessels or shortly after being released, NMFS scientists concluded that avoiding bluefin bycatch altogether was the best approach to reducing bluefin mortality. NMFS scientists further concluded that time-area closures were the most effective way to avoid bluefin bycatch.

79.     NMFS did not respond to comments that the Bluefin Bycatch Rule would promote overfishing and prevent the bluefin population from rebuilding by increasing mortality of spawning bluefin tuna. Instead, NMFS stated that the rule did not increase overall permissible catch limits. Similarly, in the FEIS, NMFS asserted that its preferred alternatives would not increase mortality of Atlantic bluefin tuna in the U.S. pelagic longline fishery because the Bluefin Bycatch Rule does not increase overall catch limits for bluefin.

80.     However, NMFS acknowledged in the FEIS that opening the Gulf GRA to pelagic longline fishing could lead to increased incidental catch of spawning bluefin tuna.

81.     Moreover, many of these "incidentally" caught bluefin will die even if they are not retained under the IBQ program. NMFS's electronic tagging studies and observer program data have found that more than half (54 percent) of all bluefin caught on longlines in the Gulf of Mexico are dead by the time they are hauled back to the fishing vessel.

82.     Despite admitting that the Bluefin Bycatch Rule would increase bycatch (and thus mortality) of spawning adult bluefin, NMFS did not analyze the effects of that increased bycatch and mortality on the reproduction needed to sustain and rebuild the already severely diminished population.

83.     In addition, NMFS stated that removal of the Gulf GRA would further the Department of Commerce's strategic plan objectives to review agency regulations and remove or modify rules that unnecessarily burden businesses and economic growth. Yet NMFS's own economic analysis predicted reopening the Gulf GRA during bluefin spawning season will most likely lead to a *decrease* in overall revenue because swordfish—a primary target species for the fishery—is significantly less abundant in the Gulf GRA. Specifically, NMFS's analysis concluded that reopening of the Gulf GRA in April and May could lead to a decrease in revenue of up to 21 percent (from $677,007 to $538,151–$687,962). Moreover, NMFS acknowledged that available data do not support fishing industry assertions that the Gulf GRA has had an adverse effect on pelagic longline fishing for permitted target species such as yellowfin tuna.

84.     In the final rule and FEIS, NMFS denies that allowing pelagic longline fishing in bluefin tuna spawning grounds, during the spawning period, will foster a *de facto* fishery for bluefin tuna because regulations only allow fishermen to catch and retain bluefin "incidentally."

NMFS admits in the FEIS, however, that pelagic longline fishermen can easily make subtle adjustments to their gear or change the time of day to set the gear to target bluefin instead of swordfish. NMFS does not explain why it now believes that allowing fishermen to catch and retain spawning bluefin "incidentally" will not foster unofficial targeting of bluefin tuna, when it established the Gulf GRA in 2014 precisely because allowing pelagic longlining in spawning grounds resulted in excessive catch of spawning bluefin—in part because it fostered a *de facto* fishery for spawning bluefin.

85.    In addition to affecting bluefin tuna, opening the Gulf GRA and the Northeastern United States Closed Area to pelagic longline fishing may affect other non-target species, including species protected under the Endangered Species Act, such as leatherback and loggerhead sea turtles and oceanic whitetip sharks, and overfished fish species, such as white marlin, blue marlin, and bigeye tuna. While NMFS admitted that the Bluefin Bycatch Rule would allow year-round pelagic longlining in areas where these species are known to occur and be taken as bycatch, NMFS summarily concluded that the rule would not adversely affect them because it would not increase overall fishing effort. However, NMFS made this conclusion without performing further analysis and without completing required consultation pursuant to Endangered Species Act Section 7, 16 U.S.C. § 1536(a)(2), before promulgating the final rule.[1]

**CLAIMS FOR RELIEF**

**Count I – NMFS Failed to Address Relevant Factors and Articulate a Rational Basis for the Bluefin Bycatch Rule, in Violation of the Administrative Procedure Act**

86.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained

---

[1] Pursuant to the Endangered Species Act citizen suit provision, 16 U.S.C. § 1540(g)(2)(A)(i), Plaintiffs sent Defendants a 60-day Notice of Intent to Sue on April 9, 2020. Should Defendants fail to cure their violations within 60 days of receiving the notice, Plaintiffs intend to file an amended complaint adding the Endangered Species Act claims to this suit.

in the preceding paragraphs.

87.     The APA requires NMFS to consider all relevant factors and draw a rational

connection between the facts in the record and its decisions in the Bluefin Bycatch Rule.

88.     In promulgating the Bluefin Bycatch Rule, NMFS failed to consider multiple

factors that were highly relevant to its decision. For example, NMFS did not address the

fundamental significance of protecting spawning bluefin tuna in order to support and rebuild the

population, or the effect of allowing increased catch of spawning bluefin tuna on the population.

89.     In addition, NMFS failed to draw a rational connection between its decision to

remove the bluefin spawning closures and the facts showing that the Gulf GRA reduced

mortality of bluefin tuna in the Gulf of Mexico by 80 to 90 percent during peak spawning

months, well beyond reductions attributable to the Individual Bluefin Quota program alone, and

did not have any demonstrable adverse effect on fishing for other species.

90.     NMFS further failed to provide an adequate, lawful explanation for reversing its

2014 decision in Amendment 7 to the Highly Migratory Species Fishery Management Plan to

protect spawning bluefin tuna through the Gulf GRA. NMFS further failed to adequately explain

its change in position regarding the need to protect spawning bluefin in the Gulf of Mexico from

increased bycatch and bycatch-related mortality and from the development or continuation of a

*de facto* targeted fishery. NMFS established the Gulf GRA in response to decades of data and

experience, as well as ICCAT directives, showing that prohibiting pelagic longline fishing in

bluefin spawning grounds, during the bluefin spawning period, is essential to conserve and

rebuild the population. Yet just five years after implementing the Gulf GRA and seeing dramatic

reductions in mortality of spawning bluefin, NMFS removed the measure. NMFS offered no

rational, evidence-based explanation for altering this carefully researched and developed

conservation and management measure.

91.     NMFS also failed to adequately explain how simply allowing fishing with pelagic longline gear in the Gulf GRA and the Northeastern United States Closed Area, without any experimental design or sampling program, would achieve its stated purpose of evaluating whether those demonstrably successful time-area closures are necessary management measures.

92.     NMFS's Bluefin Bycatch Rule is arbitrary and capricious and otherwise not in accordance with applicable law, and is reviewable under the APA, 5 U.S.C. §§ 701–706.

93.     NMFS's actions and failures to act violate the APA and are causing irreparable injury to Plaintiffs for which they have no adequate remedy at law.

**Count II – NMFS Failed to Base the Bluefin Bycatch Rule on the Best Scientific Information Available, in Violation of the Magnuson-Stevens Act and APA**

94.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

95.     The Magnuson-Stevens Act requires NMFS to base the Bluefin Bycatch Rule "upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

96.     The Western Atlantic bluefin tuna population has long suffered from overfishing and has remained at unsustainably low levels for decades. While the last ICCAT stock assessment in 2017 stated that it could not determine whether the population remained overfished, it nonetheless predicted that the population would continue to decline into 2020.

97.     The undisputed best available science shows that protecting reproductive bluefin tuna and allowing them the opportunity to spawn is essential to maintain and rebuild the long-overfished bluefin population. Increasing bycatch of reproductive adult bluefin during their spawning season will prevent successful spawning and remove biologically critical spawning bluefin from the population, thereby preventing those fish from contributing to the population.

NMFS failed to consider this evidence in the Bluefin Bycatch Rule.

98.     NMFS's decision to remove prohibitions on using pelagic longline gear in the bluefin's Gulf of Mexico spawning grounds, during the months when most spawning occurs, violates the Magnuson-Stevens Act requirement to base its regulation "upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

99.     NMFS's Bluefin Bycatch Rule is arbitrary and capricious and otherwise not in accordance with the Magnuson-Steven Act and its implementing regulations, and is reviewable under the APA, 5 U.S.C. §§ 701–706.

100.    NMFS's actions and failures to act violate the Magnuson-Stevens Act and the APA and are causing irreparable injury to Plaintiffs for which they have no adequate remedy at law.

**Count III—NMFS Failed to Demonstrate How Its Rule Would Prevent Overfishing and Rebuild the Atlantic Bluefin Tuna Population, in Violation of the Magnuson-Stevens Act and the APA**

101.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

102.    The Magnuson-Stevens Act requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery . . . ." 16 U.S.C. § 1851(a)(1). In order to achieve optimum yield, management measures must, in part, "provide[] for rebuilding to a level consistent with producing the maximum sustainable yield." 16 U.S.C. § 1802(33)(C).

103.    Since 1982, NMFS and ICCAT have agreed that protecting spawning bluefin tuna in the Gulf of Mexico is essential to end and prevent overfishing and rebuild the bluefin population.

104.    In its last stock assessment in 2017, ICCAT did not offer a determination whether

the Western Atlantic bluefin tuna population remains overfished. Nonetheless, it noted that the population was expected to decline through 2020 under current catch limits.

105.    NMFS failed to demonstrate how allowing the catch of reproductive bluefin tuna during peak of the spawning season will prevent overfishing and promote timely rebuilding of the population.

106.    NMFS's decision to allow increased catch and mortality of spawning bluefin tuna in the Gulf of Mexico violates the Magnuson-Stevens Act requirements that all fishery conservation and management measures "shall prevent overfishing while achieving on a continuing basis, the optimum yield from each fishery…," 16 U.S.C. § 1851(a)(1), and the fundamental APA requirement that NMFS consider all relevant factors and draw a rational connection between the facts in the record and its decision.

107.    NMFS's Bluefin Bycatch Rule is arbitrary and capricious and otherwise not in accordance with the Magnuson-Steven Act and its implementing regulations, and is reviewable under the APA, 5 U.S.C. §§ 701–706.

108.    NMFS's actions and failures to act violate the Magnuson-Stevens Act and the APA and are causing irreparable injury to Plaintiffs for which they have no adequate remedy at law.

**Count IV—NMFS's Bluefin Bycatch Rule Is Contrary to the Purposes and Objectives of ICCAT and ICCAT Recommendations to Protect Spawning Bluefin Tuna and Rebuild the Population, in Violation of the Atlantic Tunas Convention Act**

109.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

110.    NMFS promulgated the Bluefin Bycatch Rule under the authority of both the Magnuson-Stevens Act and the Atlantic Tunas Convention Act.

111.    ATCA directs NMFS to promulgate regulations necessary to carry out the

purposes and objectives of ICCAT, as well as regulations necessary and appropriate to carry out specific ICCAT recommendations. 16 U.S.C. § 971d(a), (c)(1)(A). One of ICCAT's fundamental purposes and objectives is to rebuild the Atlantic bluefin tuna population to a healthy level and keep it there. Since 1982, ICCAT has identified protecting spawning bluefin tuna as critical for achieving that purpose and objective, and has directed that fishing for spawning bluefin tuna be prohibited in the Gulf of Mexico.

112.     ICCAT further recommended that NMFS protect the 2003 year class of bluefin, whose spawning capacity is increasing as they mature. NMFS's decision to allow increased bycatch and mortality of these biologically critical fish contravenes ICCAT's recommendation.

113.     ATCA specifies that no regulation promulgated under it "may have the effect of increasing or decreasing any allocation or quota of fish or fishing mortality level to the United States agreed to pursuant to a recommendation of [ICCAT]." *Id.* § 971d(c)(3). Given that ICCAT has mandated a ban on fishing for spawning bluefin tuna in the Gulf since 1982, the amount of spawning bluefin mortality permissible under ICCAT authority is effectively zero.

114.     NMFS has recognized since at least 1988 that allowing fishermen to "incidentally" catch and retain bluefin tuna in their Gulf of Mexico spawning grounds fosters *de facto* targeted fishing for spawning bluefin tuna, in violation of the purposes and objectives of ICCAT and the ICCAT requirement to prohibit fishing for spawning bluefin tuna in the Gulf of Mexico.

115.     NMFS failed to explain how allowing increased catch and mortality of spawning bluefin tuna in the Gulf of Mexico, regardless of whether it is labeled "targeted" catch or "incidental" catch, is consistent with ICCAT rebuilding objectives, requirements to prohibit fishing for spawning bluefin tuna in the Gulf of Mexico, or the overall purpose to foster a

healthy, sustainable bluefin population.

116.   NMFS's Bluefin Bycatch Rule is arbitrary and capricious and otherwise not in accordance with ATCA and its implementing regulations, and is reviewable under the APA, 5 U.S.C. §§ 701–706.

117.   NMFS's actions and failures to act violate ATCA and the APA and are causing irreparable injury to Plaintiffs for which they have no adequate remedy at law.

**Count V – NMFS Failed to Take a Hard Look at the Impacts of Removing Restrictions on the Use of Pelagic Longline Gear on Atlantic Bluefin Tuna and Other Non-Target Species, in Violation of NEPA**

118.   Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

119.   NEPA requires NMFS to take a "hard look" at the environmental consequences of its actions before it takes action. NEPA's implementing regulations require NMFS to assess the environmental impacts of the proposed action. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1508.7. NEPA further requires NMFS to use high quality, accurate scientific information and to ensure the scientific integrity of this analysis. 40 C.F.R. §§ 1500.1(b), 1502.24.

120.   NEPA requires that before a federal agency takes a major action significantly affecting the quality of the human environment, it must write a detailed statement evaluating "the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C)(i).

121.   In the FEIS, NMFS concluded that its preferred alternatives will not increase mortality of Atlantic bluefin tuna in the U.S. pelagic longline fishery because the Bluefin Bycatch Rule does not increase overall catch limits for bluefin. However, NMFS failed to take a hard look at the significance of increasing catch and mortality of *spawning* bluefin tuna, thereby reducing reproduction that would otherwise help maintain and increase the population. NMFS further failed to examine or explain the effects of limiting reproduction and killing spawning

adults on the bluefin tuna population's ability to stabilize or recover.

122.    NMFS also failed to take a hard look at the impacts of opening the Gulf GRA and the Northeastern United States Closed Area on other non-target species frequently caught as bycatch in the pelagic longline fishery. The agency did not perform any analysis of how increasing these species' exposure to pelagic longline gear and associated increases in injury and death would affect even the most vulnerable species, including those that are already listed as threatened or endangered under the Endangered Species Act, or designated as overfished under the Magnuson-Stevens Act.

123.    As a result, the FEIS is invalid because NMFS failed to take a hard look at the impacts of removing prohibitions on the use of pelagic longline gear in the Gulf GRA and the Northeastern United States Closed Area under its preferred alternatives.

124.    By issuing an EIS that fails to meet the requirements of NEPA, its implementing regulations, and governing precedent, NMFS has acted in a manner that is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without observance of procedures required by law, in violation of NEPA, 42 U.S.C. § 4332, its implementing regulations, and the APA, 5 U.S.C. §§ 701–706.

125.    NMFS's actions and failures to act violate NEPA and the APA and are causing irreparable injury to Plaintiffs for which they have no adequate remedy at law.

**Count VI—NMFS Unlawfully Invoked "Good Cause" Exception to Make the Bluefin Bycatch Rule Effective Immediately Upon Publication, in Violation of the Magnuson-Stevens Act and APA**

126.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

127.    The APA generally requires a 30-day delay between the date when an agency promulgates a rule and the date that rule becomes effective. 5 U.S.C. § 553(d). The Magnuson-

Stevens Act requires that NMFS promulgate regulations in accordance with these APA procedures. 16 U.S.C. § 1855(d).

128.    An agency may waive the 30-day delay in effectiveness "for good cause." Courts have found that exceptions to the provisions of section 553 "will be narrowly construed and only reluctantly countenanced." *Am. Fed'n of Gov't Emp., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981), quoting *State of New Jersey, Department of Environmental Protection v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980). Courts have further held that the purpose of the 30-day waiting period pursuant to 5 U.S.C. § 553(d) is to inform affected parties and give them a reasonable time to adjust their behavior before the final rule takes effect. *Omnipoint Corp. v. FCC,* 78 F.3d 620, 630 (D.C. Cir. 1996).

129.    NMFS promulgated the Bluefin Bycatch Rule on April 2, one day *after* the annual April 1–May 31 prohibition on using pelagic longline gear in the Gulf GRA went into effect. NMFS waived the 30-day delay in effectiveness required by the APA and made the Rule effective immediately upon publication—effectively reopening the Gulf GRA one day after it had closed to pelagic longline fishing.

130.    NMFS alleged "good cause" based on its asserted interest in allowing pelagic longline fishermen to start fishing in the Gulf GRA immediately to ensure they could fish in these spawning areas for all of April and May—the peak bluefin spawning period. The agency alleged that delaying the effectiveness of the rule would unnecessarily delay fishing opportunities, cause confusion among fishermen, and affect NMFS's ability to compare catch data from this year to data from future years.

131.    NMFS failed to explain how making the Bluefin Bycatch Rule effective on April 2 would prevent disruption in fishing operations or avoid confusion, given that the agency failed

to give any time period to adjust to the new rule, and pelagic longline fishing vessels operating in compliance with existing regulations should have left the Gulf GRA *before* the rule's publication on April 2. For example, NMFS asserted that delaying effectiveness of the Bluefin Bycatch Rule could interfere with fishermen's ability to choose fishing locations and plan their fishing trips. Yet it failed to explain how lifting the prohibition on pelagic longline fishing in the Gulf GRA one day *after* pelagic longline vessels were required to leave the Gulf GRA somehow facilitated trip planning and avoided confusion.

132.    Moreover, NMFS's own delay in promulgating the Bluefin Bycatch Rule does not satisfy the APA's "good cause" exception for waiving the 30-day delay in effectiveness. The rulemaking process that led up to the Bluefin Bycatch Rule stretched over three years. NMFS waited six months between taking comments on its proposed rule and issuing the final rule; it waited two and a half months between issuing its FEIS and issuing the final rule. Having dragged its feet in issuing the Bluefin Bycatch Rule, NMFS may not rationally, lawfully claim that its own self-created delay is reason to abridge the APA rulemaking process.

133.    NMFS's decision to waive the 30-day waiting period between the promulgation of the Bluefin Bycatch Rule and its effective date is arbitrary and capricious and otherwise not in accordance with APA Section 553(d) and its implementing regulations, and is reviewable under the APA, 5 U.S.C. §§ 701–706.

134.    NMFS's actions and failures to act violate the APA and are causing irreparable injury to Plaintiffs, for which they have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court to enter the following relief:

1.    Declare that NMFS has violated the APA by failing to provide any rational explanation for its decision to remove the prohibition on using pelagic longline gear in the Gulf GRA and the Northeastern United States Closed Area;

2.    Declare that NMFS has violated the Magnuson-Stevens Act and APA by failing to base the Bluefin Bycatch Rule on the best available science;

3.    Declare that NMFS has violated the Magnuson-Stevens Act and APA by failing to demonstrate how removing the prohibition on using pelagic longline gear in the Gulf GRA will prevent or end overfishing;

4.    Declare that NMFS has violated ATCA and the APA by permitting increased bycatch and mortality of spawning bluefin tuna in the Gulf of Mexico, and by permitting an "incidental" fishery for spawning bluefin tuna that the agency knows will foster a *de facto* fishery for them;

5.    Declare that NMFS has violated NEPA and the APA by relying on an invalid EIS that fails to take a hard look at the effects of the alternatives expanding the times and places where pelagic longline gear may be used on bluefin tuna, other non-target fish species caught as bycatch in the pelagic longline fishery, and species protected under the Endangered Species Act;

6.    Declare that NMFS has violated the APA by improperly waiving the required 30-day delay between promulgating the Bluefin Bycatch Rule and making it effective;

7.    Vacate the Bluefin Bycatch Rule as it pertains to the Gulf GRA and Northeastern United States Closed Area and the relevant portions of the FEIS;

8.    Maintain jurisdiction over this action until NMFS is in compliance with the Magnuson-Stevens Act, ATCA, NEPA, the APA, and every order of this Court;

9.      Award Plaintiffs their reasonable attorney fees and costs pursuant to 28 U.S.C. §

2412; and

10.     Provide Plaintiffs such additional and further relief as may be appropriate.

Respectfully submitted this 29th day of April, 2020.

/s/ Khushi K. Desai
Khushi K. Desai (MD Bar 17444)
EARTHJUSTICE
1625 Mass. Ave., NW, Ste. 702
Washington, DC 20036
202-667-4500 Telephone
202-667-2356 Fax
kdesai@earthjustice.org

Andrea A. Treece (*pro hac vice* pending)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
atreece@earthjustice.org

Shana E. Emile (*pro hac vice* pending)
EARTHJUSTICE
810 3rd Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
206-343-1526 Fax
semile@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf and*
*Turtle Island Restoration Network*