# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| HEALTHY GULF, *et al.*, | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No.: DLB-20-1104 |
| NATIONAL MARINE FISHERIES SERVICE, *et al.*, | * | |
| Defendants. | * | |

## MEMORANDUM OPINION

Plaintiffs Healthy Gulf, a non-profit organization "focused on empowering people to protect and restore the natural resources of the Gulf of Mexico," and Turtle Island Restoration Network, a non-profit organization that advocates for oceans and marine wildlife, initiated this action against the National Marine Fisheries Service ("NMFS"),[1] the National Oceanic and Atmospheric Administration ("NOAA"), and the Secretary of Commerce.[2]  ECF 1, ¶¶ 1, 15, 16. Plaintiffs seek review of a final rule issued by NMFS that, among other actions, opened previously restricted areas in the Gulf of Mexico and Northeastern United States to pelagic longline fishing. *See Atlantic Highly Migratory Species; Atlantic Bluefin Tuna Fisheries; Pelagic Longline Fishery Management*, 85 Fed. Reg. 18,812 (Apr. 2, 2020) (codified at 50 C.F.R. pt. 635) ("Bluefin Bycatch Rule" or "Final Rule"); Administrative Record ("AR") 000001–32.  In their complaint, plaintiffs allege NMFS (i) violated the Administrative Procedure Act's ("APA") requirement that the agency

---

[1] Because NMFS is the agency that promulgated the relevant rule, the Court refers to NMFS both individually and when discussing the defendants collectively.

[2] The complaint named former Secretary Wilbur Ross, but current Secretary Gina Raimondo is substituted as the named defendant pursuant to Federal Rule of Civil Procedure 25(d).

consider all factors relevant to and articulate a rational basis for the Final Rule (Count I); (ii) failed to comply with the Magnuson-Stevens Fishery Conservation and Management Act's ("MSA") National Standard Two, 16 U.S.C. § 1851(a)(2), requiring that the Final Rule be based upon the best available scientific information (Count II); (iii) violated the MSA's National Standard One, 16 U.S.C. § 1851(a)(1), by failing to formulate the Final Rule to "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery" (Count III); (iv) violated section 971d(c) of the Atlantic Tunas Convention Act ("ATCA") by designing the Final Rule "contrary to the purposes and objectives" of the International Commission for the Conservation of Atlantic Tunas ("ICCAT") (Count IV); (v) violated section 4332(C) of the National Environmental Policy Act ("NEPA") by failing to take a hard look at the impact of the Final Rule on Western Atlantic bluefin tuna ("bluefin") and other nontarget species (Count V); and (vi) violated the APA by improperly invoking the good cause exception to make the Final Rule effective on the same day it was promulgated (Count VI). ECF 1, ¶¶ 86–134. This matter is before the Court on the parties' cross-motions for summary judgment. ECF 18 & 21. Both parties have replied, ECF 23 & 24, so the matter is ripe for disposition, Loc. R. 105.2(c) (D. Md. 2021). After thorough consideration of the parties' briefing and the Administrative Record, the Court denies plaintiffs' motion for summary judgment, grants defendants' cross-motion for summary judgment as to Counts I, II, III, IV and V, and dismisses Count VI for lack of standing.

## I.      Background

Bluefin are a highly migratory species whose migratory routes range thousands of miles across the North Atlantic and its adjacent waters, from Mexico to Canada. International Commission for the Conservation of Atlantic Tunas, *Report of the Standing Committee on Research and Statistics* 98 (October 2017) ("2017 ICCAT SCRS Report"), AR 028550. Bluefin

are the largest species of tuna, with adult fish reaching more than 10 feet in length and weighing more than 1,500 pounds.  *Id.* at 99, AR 028551.  Their primary spawning grounds are in the Gulf of Mexico between March and June, peaking between April and May.  NMFS, *Final Regulatory Amendment to Modify Pelagic Longline Bluefin Tuna Area-Based and Weak Hook Management Measures* 47 (January 2020) ("Final Regulatory Amendment"),[3] AR 000097; ECF 18-2, at 9. Scientists believe mature bluefin head north from June to March to "follow an annual cycle of foraging off the eastern United States and Canadian coasts."  *Final Regulatory Amendment* at 47, AR 000097.  Bluefin are very economically valuable, particularly for use in sushi.  The bluefin population, also called stock or biomass, has declined precipitously since 1950.  *2017 ICCAT SCRS Report* at 120, AR 028572.

The United States' bluefin fishery is managed by NMFS, which issues "fishery management plans" pursuant to the MSA.  16 U.S.C. § 1853; *see, e.g.*, NMFS, Highly Migratory Species Management Division, Office of Sustainable Fisheries, *Final Fishery Management Plan For Atlantic Tuna, Swordfish, and Sharks* (Apr. 1999) ("Final FMP 1999"), AR 019775 – 020662. The plans must contain 15 different elements, including descriptions of conservation and

---

[3] The Final Regulatory Amendment includes the Final Environmental Impact Statement, Final Regulatory Impact Review, Final Regulatory Flexibility Analysis, and Final Social Impact Analysis.  AR 000033.  The Final Environmental Impact Statement, prepared in compliance with NEPA, is a report on the actions' effects on the quality of the human environment.  42 U.S.C. § 4332(C).  The Final Regulatory Impact Review "provides analyses of the economic benefits and costs of each alternative to the nation and the fishery as a whole" and is prepared in compliance with Executive Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993), and the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*  *Final Regulatory Amendment* at 207, AR 000257.  The Final Regulatory Flexibility Analysis is prepared in compliance with the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*, which aims "to minimize the economic burden of federal regulations on small entities," *Final Regulatory Amendment* at 214, AR 000264.  Finally, the Final Social Impact Analysis, which is required by the MSA and in which NMFS evaluates the impact of the conservation and management measures on humans at sea, is contained in the Final Regulatory Amendment.  16 U.S.C. § 1853(a)(9).

management measures, descriptions of the fishery, and assessments of the maximum sustainable and optimum yields of the fisheries.  16 U.S.C. § 1853(a).  The plans may contain other sections, including designations of "zones where, and periods when, fishing shall be limited, or shall not be permitted, or shall be permitted only by specified types of fishing vessels or with specified types and quantities of fishing gear."  *Id.* § 1853(b)(2)(A).  All fishery management plans, moreover, "shall be consistent with" ten "national standards for fishery conservation and management."  *Id.* § 1851(a).  For example, National Standard One requires that all fishery management plans be consistent with "[c]onservation and management measures" that "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  *Id.* § 1851(a)(1).

Fishery management is laden with terms of art that are relevant here.  "Overfishing" and "overfished" "mean a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."  *Id.* § 1802(34).  Maximum sustainable yield ("MSY") is "[t]he largest average catch or yield that can continuously be taken from a stock under existing environmental conditions."  NOAA, NMFS-F/SPO-69, *NOAA Fisheries Glossary* 28 (June 2006).  Optimum yield, in contrast,

> means the amount of fish which—(A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed on the basis of the [MSY] from the fishery, as reduced by any relevant social, economic, or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the [MSY] in such fishery.

16 U.S.C. § 1802(33).  Catch-per-unit effort ("CPUE") means "catch per 10,000 hooks" set.  *Final Regulatory Amendment* at 58, AR 000108.  Recruitment is defined as "[t]he amount of fish added to the exploitable stock each year due to growth and/or migration into the fishing area.  For

example, the number of fish that grow to become vulnerable to the fishing gear in one year would be the recruitment to the fishable population that year." *NOAA Fisheries Glossary* at 39. The "term [recruitment] is also used in referring to the number of fish from a year class reaching a certain age. For example, all fish reaching their second year would be age 2 recruits." *Id.* at 40. Fishing mortality, which is expressed by the letter "F," "is roughly the proportion of the fishable stock that is caught in a year." *Id.* at 17. $F_{0.1}$ is "[t]he fishing mortality rate [at] which the increase in yield per recruit in weight for an increase of unit of effort is only 10 percent of the yield per recruit produced by the first unit of effort on the unexploited stock." *Id.* at 17–18.

NMFS implements recommendations made by ICCAT. "Since 1966, ICCAT has been responsible for international conservation and management of tuna . . . ." *Final FMP 1999* at 1-29, AR 019837. "The conservation and management recommendations of ICCAT include total allowable catches, ["TACs"], sharing arrangements for member countries, minimum size limits, effort controls, time/area closures, trade measures, compliance measures, and monitoring and inspection programs." *Id.*, AR 019837. Generally, the United States takes the TAC permitted by ICCAT and distributes it according to a codified formula to seven domestic sub-quota categories: four directed fishery categories (general, angling, harpoon, and purse seine), two incidental catch categories (longline and trap), and a reserve category. 50 C.F.R. § 635.27(a) (2018).

Over time, different management measures have been used in the bluefin fishery. During the 1980 winter and spring fishing season in the Gulf of Mexico, NMFS "became aware that . . . a number of U.S. longline vessels fishing for swordfish began to land increasing quantities of giant Atlantic bluefin tuna." *Atlantic Bluefin Tuna*, 46 Fed. Reg. 8,012, 8,013 (Jan. 26, 1981) (codified at 50 C.F.R. pt. 285, AR 019758. Longlining is a fishing method that involves a primary fishing line, extending horizontally for five to 40 miles, from which dangle many shorter lines with baited

5

hooks. 50 C.F.R. § 635.2. Generally, "20 to 30 hooks per mile are attached to the [primary fishing line, or] mainline." ECF 21–2, at 11. NMFS was "concerned that [the bluefin population] [was] not strong enough to withstand additional heavy fishing pressure; and that the development of a new directed fishery for Atlantic bluefin tuna [was] contrary to [its] ICCAT commitments." *Atlantic Bluefin Tuna*, 46 Fed. Reg. at 8,013, AR 019758. Thus, since 1981, NMFS has prohibited fishermen from using pelagic longline gear to target, or fish directly for, bluefin. *Id.* at 8,012, AR 019757–60.

Due to other sources of fishing pressure, in 1997, NMFS determined bluefin were overfished. *Final Regulatory Amendment* at 40, AR 000090. In 1998, ICCAT instituted a 20-year bluefin population rebuilding plan. *2017 ICCAT SCRS Report* at 113, AR 028565. The goal of the rebuilding plan was "reaching stock levels to support maximum sustainable yield." *Final FMP 1999* at 2-8, AR 019860. ICCAT split a TAC of 2,500 metric tons between the United States, Japan, Canada, Bermuda, St. Pierre, and Miquelon. *Id.* at 2-9, AR 019860.

Throughout the 20-year rebuilding period, NMFS instituted several of its own conservation and management measures. In 1999, NMFS instituted the "Northeastern United States Closed Area," which closed to pelagic longline fishing an area off the coast of New Jersey from June 1 through June 30 of each year. *Bluefin Bycatch Rule*, 85 Fed. Reg. at 18,812, AR 000001. Beginning in 2011, NMFS required that pelagic longliners in the Gulf of Mexico use weak hooks to "allow incidentally hooked bluefin" to escape more easily.[4] *See Atlantic Highly Migratory Species; Bluefin Bycatch Reduction in the Gulf of Mexico Pelagic Longline Fishery*, 76 Fed. Reg. 18,653 (Apr. 5, 2011) (codified at 50 C.F.R. pt. 635) ("Weak Hook Rule"), AR 022391 – 022399.

---

[4] The Bluefin Bycatch Rule changed the ban on weak hooks from a year-round to a seasonal prohibition (January – June). Plaintiffs do not challenge this aspect of the Bluefin Bycatch Rule.

The hooks "straighten to release large fish, such as bluefin tuna, when they are caught, while retaining smaller fish, such as swordfish and other tunas." *Bluefin Bycatch Rule*, 85 Fed. Reg. at 18,812, AR 000001.  As an additional rationale for the Weak Hook Rule, NMFS observed that "reducing the incidental [bluefin] catch in the [Gulf of Mexico] may [have] enable[d] the [pelagic longline] fishery to continue to participate in directed fisheries (e.g., yellowfin tuna . . . and swordfish) year-round with less risk of fishery interruption due to insufficient [bluefin] subquota availability in the [l]ongline [c]ategory."  *Weak Hook Rule*, 76 Fed. Reg. at 18,563, AR 022391.

In December 2014, NMFS promulgated Amendment 7, a final rule amending the operative 2006 Consolidated Atlantic Highly Migratory Species Fishery Management Plan. *Atlantic Highly Migratory Species; 2006 Consolidated Atlantic Highly Migratory Species (HMS) Fishery Management Plan; Amendment 7*, 79 Fed. Reg. 71,510 (Dec. 2, 2014) (codified at 50 C.F.R. pt. 635) ("Amendment 7"), AR 022489 – 022588.  Amendment 7 implemented a suite of management measures "designed to allow fishery participants to fully harvest, but not exceed, the U.S. bluefin quota." *Id.* at 71,511, AR 022491.  Among them included establishing in the Gulf of Mexico two gear-restricted areas ("GRAs"), where no pelagic longline fishing could occur from April 1 to May 31, "to reduce dead discards and protect bluefin tuna on their spawning grounds"; increasing the longline bluefin sub-quota to 8.1% of the U.S. total allowable catch plus 62.5 metric tons; and instituting the Individual Bluefin Quota ("IBQ") Program, a complex new allocation system that requires each longline vessel to account for its bluefin landings and dead discards using a percentage share of the total available longline sub-quota. *Id.* at 71,512 & 71,514, AR 022492 & 022494; *see also* 50 C.F.R. § 635.15.

The IBQ Program "was designed to introduce individual accountability to permitted longline vessels for bluefin bycatch and incentivize those participating in the pelagic longline

fishery to minimize interactions with bluefin as a conservation and management measure for the stock."  NMFS, *Three-Year Review of the Individual Bluefin Quota Program* 1 (Sept. 2019) ("Three-Year IBQ Review"), AR 000699.  Under the program, qualified vessels receive one of three tiers of percentages of the longline quota: 1.2 percent, 0.6 percent, or 0.37 percent.  *Id.* at 11, AR 000709.  In determining which percentage a qualified vessel receives, NMFS considers two factors: (1) "historical bluefin catch from vessel logbook data, expressed as a ratio of the number of bluefin interactions to 'designated species' landings"; and (2) "'designated species' landings for a vessel."  *Id.*, AR 000709.  "Past fishing that resulted in fewer bluefin interactions resulted in larger IBQ shares."  *Id.*, AR 000709.  Landings of designated species serve as a proxy for fishing effort and demonstrate "success at harvesting targeted species and minimizing bluefin bycatch interactions, recognizing that greater levels of fishing activity are likely to be correlated with greater numbers of bluefin interactions."  *Id.*, AR 000709.

Shares are designated either as Gulf of Mexico or Atlantic.  *Three-Year IBQ Review* at 11, AR 000709.  Longline vessels in the Gulf of Mexico may account for bluefin bycatch only with Gulf of Mexico IBQ allocations.  50 C.F.R. § 635.15(b)(2).  This limits "potential shifts in effort" from Atlantic fishing areas to the Gulf of Mexico.  *Three-Year IBQ Review* at 12, AR 000710.  Each eligible vessel must have the minimum required IBQ allocation before it may depart on a trip.  *See Amendment 7*, 79 Fed. Reg. at 71,515, AR 022495.  To depart on a trip in the Atlantic with pelagic longline gear, a vessel must have at least 0.125 metric tons worth of remaining shares.  *Three-Year IBQ Review* at 12, AR 000710.  To depart on a fishing trip in the Gulf of Mexico, a pelagic longline vessel must have 0.25 metric tons of remaining shares.  *Id.*, AR 000710.  All pelagic longline vessels with valid Atlantic Tunas Longline permits may lease and sub-lease

shares. *Id.* at 13, AR 000711. The leasing program permits a shifting of shares between vessels with varying degrees of bluefin interactions.

In 2019, upon reviewing the IBQ Program after three years' operation, NMFS concluded the Program was "successful in limiting bluefin bycatch in the pelagic longline fishery." *Id.* at 2, AR 000700. NMFS primarily compared data from the "Baseline period," which was from 2012 to 2014, and the "IBQ period," which was from 2015 to 2017. "During the IBQ period, bluefin catch totaled 35 percent, 51 percent, and 45 percent of the adjusted Longline category quota in 2015, 2016, and 2017, respectively." *Id.*, AR 000700. "In contrast, during the Baseline period, bluefin catch represented 365 percent, 972 percent, and 210 percent of the adjusted Longline category quota in 2012, 2013, and 2014, respectively."[5] *Id.*, AR 000700. Landings and dead discards in the Baseline period from 2012–14 averaged 233 metric tons per year, while in the IBQ period landings and dead discards averaged just 81.3 metric tons per year. *Id.* at 3, AR 000701. NMFS found "[t]he specific regulations that provided the most incentives for vessel operators to avoid bluefin were the IBQ accounting requirements." *Id.*, AR 000701. "The potential need for vessel owners to lease additional IBQ allocation in order to account for bluefin catch and satisfy the minimum IBQ Program requirements, and the cost of such leasing, provided additional

---

[5] The decrease in percentage of pelagic longline quota caught is due in part to an increase in the quota made available to pelagic longline vessels at the start of the IBQ Program. In 2012, 2013, and 2014, the pelagic longline adjusted quotas were 78.4 metric tons, 21.0 metric tons, and 99.2 metric tons, respectively. *Final Regulatory Amendment* at 26 (Table 3.1), AR 000724. In 2016, 2017, and 2018, the adjusted quotas were 182.3 metric tons, 193.3 metric tons, and 208.1 metric tons, respectively. *Id.*, AR 000724. However, even accounting for this change, the IBQ Program was successful. The total pelagic longline catch, which includes landed bluefin and dead discards, was 286.4 metric tons, 204.1 metric tons, and 208.7 metric tons in 2012, 2013, and 2014, respectively. *Id.*, AR 000724. The total pelagic longline catch in 2015, 2016, 2017, and 2018 was 63.5 metric tons, 92.7 metric tons, 87.7 metric tons, and 98.6 metric tons, respectively. *Id.*, AR 000724. The greatest decreases came from reductions in dead discards, which far out-paced landed bluefin between 2012 and 2014. *Id.* at 26 (Fig. 3.1), AR 000724. Landed bluefin have remained relatively constant. *Id.*, AR 000724.

incentive to avoid bluefin tuna during pelagic longline fishing operations." *Id.*, AR 000701.  Still, NMFS concluded that "[i]t [was] difficult to attribute the overall reduction in bluefin catch to a specific fishing behavior, due to the number of factors that affect catch in a commercial fishery and the number of factors affecting fishing behavior in addition to the IBQ Program." *Id.*, AR 000701.

In 2017, ICCAT determined that bluefin overfishing "was not occurring." *2017 ICCAT SCRS Report* at 102, AR 028554.  ICCAT, however, was not able to evaluate whether the stock had been rebuilt.  *Id.* at 113, AR 028565; ICCAT, *Recommendation by ICCAT for and Interim Conservation and Management Plan for Western Atlantic Bluefin Tuna* 1 ("ICCAT Rec. 17-06"), AR 025138.  It did estimate "that the biomass of the western stock of bluefin tuna ha[d] been increasing since about 2004, after two decades of stability, and in 2015 was at 69% of the 1974 biomass level under one model and 45% of the 1974 level under another." *ICCAT Rec. 17-06* at 1, AR 025138.  ICCAT also acknowledged "the longstanding uncertainty in estimating future recruitment," a factor it relied upon in its earlier stock assessments.  *Id.*, AR 025138.  Significantly, in 2017 and in light of that uncertainty, ICCAT shifted toward providing "short-term management advice based on a fishing mortality rate (i.e., $F_{0.1}$)."[6] *Id.*, AR 025138.  This strategy uses "recent recruitment assuming that near term recruitment will be similar to recent past recruitment." *2017 ICCAT SCRS Report* at 111, AR 028563.  It "compensates for the effect of recruitment changes on biomass by allowing higher catches when recent recruitment is higher, and reducing catches when recent recruitments are lower." *Id.* at 113, AR 028565.  This strategy also "accounts for the effect

---

[6]  To reiterate, $F_{0.1}$ is "[t]he fishing mortality rate [at] which the increase in yield per recruit in weight for an increase of unit of effort is only 10 percent of the yield per recruit produced by the first unit of effort on the unexploited stock." *Id.* at 17–18.  This is a complicated formula that focuses on the amount of fishing effort that produces diminished yield-per-recruit.

of recruitment changes on stock biomass" because "fishing consistently at $F_{0.1}$ would, over the long-term, cause the stock to fluctuate around a biomass level associated with that fishing mortality rate (i.e., $B_{0.1}$), whatever the future recruitment potential." *ICCAT Rec. 17-06* at 1, AR 025138.

On April 2, 2020, NMFS, citing underharvest of target species, promulgated and immediately implemented the Bluefin Bycatch Rule. NMFS sought to "ensure that conservation obligations [were] met and that bluefin bycatch continue[d] to be minimized, but in a way that [was] not unnecessarily restrictive of pelagic longline fishery effort." *Bluefin Bycatch Rule*, 85 Fed. Reg. at 18,812, AR 000001. The Bluefin Bycatch Rule converted the Gulf of Mexico GRAs and the Northeastern United States Closed Area into "Monitoring Areas," effectively reopening them to pelagic longline fishing vessels during periods of high bluefin activity. *Bluefin Bycatch Rule*, 85 Fed. Reg. at 18,814, AR 000003. The Final Rule set an April to May bluefin catch threshold for the Gulf of Mexico Monitoring Areas of 63,150 pounds, or the equivalent of approximately 114 fish, *Final Regulatory Amendment* at 167 & 169, AR 000217 & 000219, and a June bluefin catch threshold in the Northeastern United States Monitoring Area of 150,519 pounds, or approximately 546 fish, *id.* at 128 & 130, AR 000178 & 000179. The thresholds are set to discourage the concentration of a year's worth of fishing effort into the monitoring areas. *Id.* at 170, AR 000220. If either threshold is met—or projected to be met—during the relevant monitoring periods, NMFS files a closure notice in the Federal Register. *Final Regulatory Amendment* at 167 & 128, AR 000178 & 000217. "On and after the effective date of [that] notice, the Monitoring Areas would be closed to pelagic longline fishing each year" during the relevant time periods "unless NMFS takes further action." *Id.*, AR 000178 & 000217. The Final Rule set a three-year evaluation period for all Monitoring Areas, from 2020 through 2022. *Bluefin Bycatch Rule*, 85 Fed. Reg. at 18,814, AR 000003. After the evaluation period, NMFS will produce a

report and consider longer-term management measures based on the findings.  *Id.* at 18,823, AR 000012.

Plaintiffs filed suit on April 29, 2020, alleging NMFS' promulgation of the Bluefin Bycatch Rule violated principles of administrative law and several provisions of the statutes governing management of the bluefin fishery.  ECF 1.  The parties filed motions for summary judgment.

## II.  Analysis

### A.  Standard of Review

This Court "may hold unlawful and set aside a federal agency action for certain specified reasons, including whenever the challenged act is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  *Wild Virginia v. U.S. Forest Serv.*, --- F.4th ----, 2022 WL 215125, at *6 (4th Cir. Jan. 25, 2022) (quoting *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 589–90 (4th Cir. 2018) (alteration and internal quotation marks omitted)); 5 U.S.C. § 706(2)(A).  In undertaking that analysis, the Court must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546, 557 (D. Md. 2020).  Review under the APA is "highly deferential" to the agency.  *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014).  Heightened deference is owed when the question before the Court "'involves primarily issues of fact' that implicate 'substantial agency expertise'" "and the agency is tasked with balancing often-competing interests."  *Id.* (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376–77 (1989)).  "[Y]et the arbitrary-and-capricious standard does not reduce judicial review to a rubber stamp of agency action."  *Friends of Back Bay v. U.S. Army Corps of Engineers*, 681 F.3d 581, 587 (4th Cir. 2012).  Instead, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found

and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency may not "entirely fail[] to consider an important aspect of the problem" or "offer[] an explanation for its decision that runs counter to the evidence before" it. *Id.* The Court's inquiry "must be searching and careful" but "narrow." *Marsh*, 490 U.S. at 378. "In the end, 'if the agency has followed proper procedures, and if there is a rational basis for its decision, [this Court] will not disturb its judgment." *Webster v. U.S. Dep't of Agriculture*, 685 F.3d 411, 422 (4th Cir. 2012) (quoting *Hodges v. Abraham*, 300 F.3d 432, 445 (4th Cir. 2002)) (internal alterations omitted).

### B. Compliance with the MSA

Congress passed the Magnuson-Stevens Fishery Conservation and Management Act to establish a comprehensive framework for the conservation and management of the nation's fishing resources. The MSA empowers agencies "(1) to take immediate action to conserve and manage the fishery resources found off the coasts of the United States"; "(2) to support and encourage the implementation and enforcement of international fishery agreements for the conservation and management of highly migratory species"; and "(3) to promote domestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. § 1801(b). Fishery management plans, the primary means through which the MSA's objectives are met, must contain the measures "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853(a)(1)(A). If NMFS determines that a species is overfished, it shall develop and implement a fishery management plan "to end overfishing immediately . . . and to rebuild affected stocks." 16 U.S.C. § 1854(e). For "highly migratory species for which the United States is authorized to harvest an allocation, quota, or at a

fishing mortality level under a relevant international fishery agreement," such as bluefin, any fishery management plan must give U.S. fishing vessels "a reasonable opportunity to harvest such allocation, quota, or at such fishing mortality level."  16 U.S.C. § 1854(g)(1)(D).

The MSA vests "broad authority to manage and conserve coastal fisheries" with the Commerce Department.  *Kramer v. Mosbacher*, 878 F.2d 134, 135 (4th Cir. 1989).  The Commerce Department, in turn, delegates authority to NMFS to issue and amend fishery management plans and implement regulations.  *See* 16 U.S.C. § 1854(c).  Although NMFS does have broad discretion in administering the nation's fisheries, all fishery management plans must comply with ten national standards.  *Id.* § 1851(a).  Plaintiffs allege the fishery management plan for bluefin under the Bluefin Bycatch Rule does not comply with the first two national standards.  ECF 1, ¶¶ 94–108. National Standard One requires that "[c]onservation and management measures . . . prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  16 U.S.C. § 1851(a)(1).  National Standard Two requires that "[c]onservation and management measures . . . be based upon the best scientific information available."  *Id.* § 1851(a)(2).  Because discussion of National Standard Two frames the discussion for the remainder of the opinion, the Court considers it first.

### 1.    National Standard Two

National Standard Two requires NMFS to base all fishery management plans upon "the best scientific information available."  *Id.* § 1851(a)(2).  "Scientific information includes, but is not limited to, factual input, data, models, analyses, technical information, or scientific assessments."  50 C.F.R. § 600.315(a)(4).  It should be "high quality and timely."  *Id.* § 600.315(a)(1).  Any scientific information upon which the agency relies must "include an evaluation of its uncertainty."  *Id.* § 600.315(a)(2).  The agency's action must acknowledge any

"risks associated with the sources of uncertainty," including the risk of overfishing.  *Id.*  Where information is limited, "greater use of proxies for quantities that cannot be directly estimated" can be necessary and appropriate.  *Id.* § 600.315(a)(3).  This standard requires NMFS to base any rules it issues "on a thorough review of all the relevant information available at the time the decision was made," ensuring the agency "does not disregard superior data in reaching its conclusions." *The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005), *aff'd sub nom. Oceana, Inc. v. Gutierrez*, 488 F.3d 1020 (D.C. Cir. 2007).  It is a "practical standard" that mandates "only that fishery regulations be diligently researched and based on sound science." *Id.* Consequently, "legal challenges under National Standard Two are frequently unsuccessful, and absent some indication that superior or contrary data was available and that the agency ignored such information, a challenge to the agency's collection of and reliance on scientific information will fail." *Ctr. for Biological Diversity v. Blank*, 933 F. Supp. 2d 125, 148 (D.D.C. 2013).  NMFS "necessarily ha[s] some discretion" to set quota levels. *Fishermen's Dock Co-op., Inc. v. Brown*, 75 F.3d 164, 171 (4th Cir. 1996) (holding that calculation of quota using a recruitment estimate one standard deviation below the geometric mean was within the agency's discretion).

The parties agree the 2017 ICCAT stock assessment was the best scientific information available to NMFS.  ECF 18-2, at 21–22; ECF 21-2, at 28–31.  In its 2017 stock assessment, ICCAT shifted the basis for its recommendations on bluefin management from maximum sustainable yield-based reference points to "fishing mortality reference points." *2017 ICCAT SCRS Report* at 113, AR 028565.  ICCAT adopted this approach because of "continued uncertainty about spawning biomass and recruitment potential," knowledge of which is necessary to calculate maximum sustainable yield. *Id.* at 98 & 113, AR 028550 & 028565.  The uncertainty about future recruitment—a measure inextricably linked to spawning—was not unique to the 2017 assessment.

15

For example, in 2015, ICCAT "caution[ed] that the conclusions of [the 2015] assessment do not capture the full degree of uncertainty in the assessments and projections . . . [an] important source of uncertainty is recruitment." *Report of the Standing Committee on Research and Statistics* 113 (Sept. – Oct. 2015) ("2015 ICCAT SCRS Report"), AR 027788.  The report suggested "a more fruitful course may be to move away from the current high/low recruitment dichotomy and focus instead on adopting certain biological reference points and developing management procedures that are robust to these recruitment and other sources of uncertainty." *Id.* at 114, AR 027789. ICCAT did exactly this in 2017.  That year, ICCAT concluded that a fishing mortality-based strategy was a "reasonable proxy" for a maximum sustainable yield-based strategy. *Id.* at 113, AR 028565.  Under the mortality-based model, the focus "is on giving short-term advice based on F reference point ($F_{0.1}$), a proxy for $F_{MSY}$, using recent recruitment assuming that near term recruitment will be similar to the recent past recruitment." *Id.* at 111, AR 028563.  Further, "fishing consistently at $F_{0.1}$ will, over the long-term[,] cause the stock to fluctuate around [the corresponding long-term biomass,] $B_{0.1}$, whatever the future recruitment potential." *Id.* at 98, AR 028550.[7]  Thus, ICCAT's new approach uses actual, recent recruitment numbers to formulate the appropriate TAC.

Plaintiffs do not challenge the methodology employed by ICCAT.  Indeed, plaintiffs acknowledge that ICCAT's stock assessment was the best available science at the time the Bluefin Bycatch Rule was promulgated.  ECF 18, at 21–22.  Rather, plaintiffs argue, this shift in

---

[7] Plaintiffs insist that the "basic concept of maximum sustainable yield . . . is central to fishery management" under the MSA.  *See* ECF 23, at 12.  But use of a proxy for a quantity "that cannot be directly estimated" is contemplated by the MSA's implementing regulations.  50 C.F.R. § 600.315(a)(3).  Specifically regarding MSY, the Code directs adoption of "other measures of reproductive potential that can serve as reasonable proxies." *Id.* § 600.310(e)(1)(v)(B).

management strategy notwithstanding, NMFS should have put more emphasis on *spawning* bluefin. Plaintiffs do not present any argument as to why an emphasis on future spawning was required when the best available science itself did not identify future spawning as a metric essential to bluefin fishery management. Spawning, moreover, is considered in ICCAT's methodology in terms of actual, recent recruitment—"[t]he amount of fish added to the exploitable stock each year due to growth and/or migration into the fishing area." *NOAA Fisheries Glossary* at 39. This methodology necessarily considers recent bluefin spawning. Should excess fishing pressure disproportionately reduce recruitment in a given year, the TAC would be reduced in a future year to reflect the change. ICCAT's mortality-based approach, therefore, is dynamic—responsive to the actual, recent changes in the bluefin fishery, including recent spawning.

Plaintiffs identify scientific information from more than a decade ago that touches upon the importance of protecting spawning bluefin. But that information is dated and therefore was not the best available science when the Bluefin Bycatch Rule was promulgated. In 2017, ICCAT determined that overfishing of bluefin was not occurring—a determination that followed a 20-year population rebuilding plan. This positive change in the state of the bluefin fishery afforded NMFS more latitude in managing the fishery than it had when bluefin were deemed overfished. In addition, starting in 2017 and as discussed above, ICCAT shifted its advice from relying on high and low recruitment scenarios to short-term advice based on recent recruitment. The focus from 2017 onward was on bluefin mortality. Finally, Amendment 7, which went into effect in 2015, established other fishery management measures, such as the effective IBQ Program. Scientific information preceding these changes analyzed a different state of ecological affairs than those that existed when Amendment 7 imposed the GRAs or when the Bluefin Bycatch Rule converted the GRAs into monitoring areas.

Plaintiffs argue, for example, that NMFS erred in ignoring advice from bluefin experts, such as the authors of a 2010 study.  ECF 23, at 12.  The 2010 Teo & Block study predated implementation of the 2011 Weak Hook Rule and the suite of conservation and management measures in Amendment 7, including both the IBQ Program and the GRAs.  These policies, which instituted major changes to bluefin management in the Gulf of Mexico, were therefore not considered in the 2010 study.  *See* 50 C.F.R. § 600.315(a)(1) ("[f]ishery conservation and management require high quality and timely . . . scientific information").  Additionally, the Teo & Block study does not make specific findings that support plaintiffs' broad argument.  *See* Teo & Block, *Comparative Influence of Ocean Conditions, supra*, at 10, AR 024868 (cited by plaintiffs at ECF 18-2, at 20).  While the study supports the relevance of protecting the bluefin spawning population to rebuilding efforts, it does not find a focus on spawners is the *only* way to prevent overfishing and support rebuilding.  *Id.*, AR 024868

To the extent the best available scientific information should have emphasized protecting spawners, plaintiffs overlook significant management measures designed to protect spawners and inappropriately focus on the GRAs as the only means to that end.  Directed fishing for bluefin in the Gulf of Mexico remains prohibited.  And, while plaintiffs argue NMFS is creating a *de facto* directed fishery such that existed prior to Amendment 7 by permitting incidental catch by longliners in the monitoring areas, plaintiffs do not acknowledge that the IBQ Program stands as a barrier to targeting bluefin in the Gulf of Mexico.  The design of the IBQ Program contemplates individual vessel accountability.  Vessels engaging in targeted bluefin fishing run the very real risk of a prohibition on fishing entirely without sufficient IBQ shares to embark.  While NMFS did not weigh the protection of spawning bluefin as heavily as plaintiffs would like, the Administrative Record is clear that the agency considered spawning.  Indeed, NMFS specifically limited the

amount of bycatch that can occur in the Gulf of Mexico GRAs where spawning primarily occurs and promulgated a failsafe provision that would close the areas to pelagic longline fishing should that amount be caught.  The Court reiterates here the deference owed agencies when reviewing actions that "implicate substantial agency expertise."  *Am. Whitewater*, 770 F.3d at 1115.

Protecting spawners is a means to an end—the prevention of overfishing and the rebuilding of overfished stocks, per 16 U.S.C. § 1853(a)(1)(A))—not an end in and of itself.  By relying on the 2017 ICCAT stock assessment, which accounted for uncertainty and reasonably used fishing mortality references points as proxies for maximum sustainable yield reference points, NMFS reasonably complied with National Standard Two's requirement that its fishery management plan be based on the best scientific information available.  *See Ctr. for Sci. in the Pub. Int.*, 438 F. Supp. at 557.

### 2.    National Standard One

With regard to National Standard One, the Court's role is only to decide whether the agency's conclusion that the Final Rule prevents overfishing is "rational and supported by the record."  *Ctr. for Biological Diversity*, 933 F. Supp. 2d at 141 (citing *C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1562 (D.C. Cir. 1991)).  Plaintiffs allege NMFS unlawfully "simply assume[d] that constraining catch to the ICCAT quota will in and of itself prevent overfishing" without doing any of its own analysis.  ECF 23 at 10.  In support, they cite dicta in *Center for Biological Diversity* that the agency there "reviewed and evaluated the underlying data and statistics upon which the ICCAT recommendation was based."  *Id.* at 142.

Plaintiffs' claim that NMFS failed to perform analysis of its own is belied by the Administrative Record.  NMFS admittedly relied heavily on the 2017 ICCAT assessment.  But it also relied on its own previously codified regulatory formula, adopted by Amendment 7 and

recalculated in 2018 to reflect the latest ICCAT-recommended TAC allocation.   50 C.F.R. §
635.27(a) (2018).  Both the quotas for the Gulf of Mexico Monitoring Areas and the Northeastern
Monitoring Area, 63,150 pounds and 150,519 pounds, respectively, fall within the overall Gulf of
Mexico and Atlantic quotas.  *Final Regulatory Amendment* at 131 & 169, AR 000163 & 000219.
NMFS correctly points out in its briefing that, to the extent plaintiffs challenge the quotas
generally, "claims challenging the fishery's incidental catch or retention of bluefin tuna in the Gulf
of Mexico are time-barred pursuant to the judicial review provisions of the [MSA], 16 U.S.C. §
1855(f)."  ECF 21-2, at 27.  Moreover, NMFS analyzed the effects of what became the Bluefin
Bycatch Rule "specifically on spawning bluefin tuna," finding it "could slightly increase incidental
catch of spawning bluefin" but that any "such increases would be within previously analyzed,
applicable quotas and would be consistent with other management measures that NMFS adopted
to appropriately limit bycatch and conserve the stock."  *Final Regulatory Amendment* at 170, AR
000220.  NMFS estimated the annual effect of the Bluefin Bycatch Rule in the Gulf of Mexico
would be 3 to 7 bluefin kept, and 5 to 7 bluefin discarded.  *Id.*, AR 000220.  Under a "No Action"
alternative that would have left in place the GRAs, the estimated annual bycatch would be 4 bluefin
kept and 5 bluefin discarded.  *Id.*, AR 000220.  NMFS also analyzed the effect of the Bluefin
Bycatch Rule in what had been the Northeastern Closed Area, estimating the "predicted effort that
would occur . . . using both historical and current effort."  *Id.* at 129, AR 000179.  Under the Final
Rule, NMFS predicted that 4–58 bluefin would be kept and 0–1 discarded from within the
Northeastern Monitoring Area.  *Id.* at 123, AR 000173.

        As already discussed at length, the 2017 ICCAT stock assessment was the best available
science.  While its report emphasized the "uncertainty" of its conclusions and projections, its
qualifying language was similar to language in previous ICCAT assessments.  *Compare 2017*

*ICCAT SCRS Report* at 111, AR 028563, with *2015 ICCAT SCRS Report* at 113, AR 027788.[8]
The 2017 ICCAT stock assessment was meant as "short-term management advice" to be revisited
in the 2020 stock assessment. *ICCAT Rec. 17–06* at 1–2, AR 025138–39. Based on the 2017 stock
assessment, the best science available when the Bluefin Bycatch Rule was promulgated in April
2020, NMFS also implemented a short-term plan to monitor the designated areas for three years.
Plaintiffs decry NMFS's reliance on ICCAT recommendations that were only effective through
2020 to justify a rule "expected to remain in effect until at least 2022." ECF 23, at 10. But the
Final Rule provides that "[i]f the ICCAT western Atlantic bluefin tuna quota were to decrease . . .
NMFS would adjust the threshold downward to an equivalent threshold level. If the quota
increases, the threshold would remain the same." *Bluefin Bycatch Rule*, 85 Fed. Reg. at 18,814,
AR 000003. The agency's reliance on short-term but best available scientific information to
promulgate a short-term rule was rational.

Ultimately, plaintiffs challenge policy changes that "fall within the overall quota and
subquota limits previously implemented." *See Ctr. for Biological Diversity v. Blank*, 933 F. Supp.
2d at 147. The pelagic longline category accounts for less than 15% of the U.S. bluefin industry,
and the Bluefin Bycatch Rule lifts only one of a suite of management measures, and only for three
years and subject to monitoring and a failsafe provision. Based on analyses that plaintiffs do not
discredit, there will be minimal impact on bluefin. NMFS's conclusion that the Bluefin Bycatch
Rule would prevent overfishing thus was "rational and supported by the record." *See id.* at 141
(citing *C & W Fish Co.*, 931 F.2d at 1562).

---

[8] *See also* note 7, *supra*.

## C.  Articulation of a Rational Basis under the APA

As discussed above, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.  No rule prohibits "an agency from supporting its action with several explanations." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 409 F. Supp. 3d 367, 379 (D. Md. 2019).  Where "at least one of the reasons provided . . . [was] consistent with the justifications given," this Court has found a "rational connection between the facts found and the choice made." *See id.* (quoting *State Farm*, 463 U.S. at 43); *see also Roe v. Dep't of Def.*, 947 F.3d 207, 225 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (concluding a rule was arbitrary because "each explanation offered" by the agency was unsupported).

NMFS explained the purposes of the Final Rule were to:

(1) [c]ontinue to minimize, to the extent practicable, bycatch and bycatch mortality of bluefin tuna . . . by pelagic longline gear consistent with the [applicable] conservation and management objectives . . . ; (2) simplify and streamline Atlantic HMS [highly migratory species] management, to the extent practicable, by reducing any redundancies in [applicable] regulations . . . ; and (3) optimize the ability for the pelagic longline fishery to harvest target species quotas (e.g., swordfish), to the extent practicable, while also considering fairness among permit/quota categories.

*Bluefin Bycatch Rule*, 85 Fed. Reg. at 18,813–14, AR 000002–03.  Plaintiffs argue the agency's three purposes for the conversion of the Northeastern United States Closed Area and the Gulf GRAs into monitoring areas are not rationally connected to the facts in the record.

### 1. Minimizing Bycatch to the Extent Practicable

The conversion of the Northeastern United States Closed Area and the Gulf of Mexico GRAs into monitoring areas is rationally related to NMFS' stated objective of "minimiz[ing], to the extent practicable, bycatch and bycatch mortality of bluefin tuna . . . by pelagic longline gear consistent with the conservation and management objectives (*e.g.*, prevent or end overfishing,

rebuild overfished stocks, manage Atlantic HMS fisheries for continuing optimum yield) of the 2006 Consolidated Atlantic HMS FMP, its amendments, and all applicable laws." *See Bluefin Bycatch Rule*, 85 Fed. Reg. at 18,813, AR 000002. Consistent with its dual-purpose mandate to prevent overfishing but facilitate the optimum harvest from the fishery, 16 U.S.C. § 1851(a), NMFS established a monitoring program over the formerly closed areas to ensure that, should yield approach the acceptable limits, the areas close, *Final Regulatory Amendment* at 21 & 169, AR 000071 & 000219. This approach accounts for the risk of overfishing. Further, because the IBQ Program, in effect since its institution by Amendment 7, remains in place, NMFS retains the means to closely track the amount of bluefin bycatch occurring within the monitoring areas. Significantly, NMFS' statutory or regulatory objective is to reduce bycatch to the extent practicable, not to the extent *possible*. Therefore, the adaptation of any one management strategy—here, turning closed areas into monitoring areas—does not necessarily impede the agency's work to limit bycatch to the extent *practicable*, considering its additional purpose to ensure the optimum yield from the fishery.

NMFS also squarely acknowledged the concern of increasing bycatch of spawning bluefin and pointed out the uncertainty about the effectiveness of each individual fishery management measure in or around the time of Amendment 7 because multiple measures were instituted at the same time:

> Both the IBQ program and the Spring Gulf of Mexico Gear Restricted Area, along with reduced fishery effort that has been occurring with the Gulf of Mexico over the last decade, have likely played a role in reducing bluefin tuna interactions. Because the IBQ Program and the gear restricted areas were implemented at the same time, it is difficult to separate out the impact each has had in relation to reducing bluefin tuna interactions and catch. NMFS therefore strongly prefers an evaluative option that will enable certain data collection under a single management tool, the IBQ Program. These data could then be compared to data that were collected while both the IBQ Program and the gear restricted areas were in place to better evaluate the impacts when both regulatory measures were in place against

the impacts of having just one measure (the IBQ Program) in place.  This evaluation will enable NMFS to determine whether there remains sufficient justification to retain both management measures, each of which may be effective in their own right but are not necessarily needed to continue in tandem to minimize bluefin tuna bycatch mortality to the extent practicable given other management objectives that also must be considered, particularly where all of these actions occur within an overall, science-based total allowable catch.

*Final Regulatory Amendment* at 310, AR 000360.  NMFS, thus, did not conclude the GRA was unnecessary to reduce bycatch to the extent practicable.  Rather, the agency identified uncertainty over whether GRAs and the IBQ Program were necessary, simultaneous management tools; developed a three-year monitoring plan; and scheduled a reassessment of the bluefin mortality in the previously demarcated GRAs to determine the precise impact the GRAs had—or did not have—on the maintenance of the bluefin tuna population.

Plaintiffs argue NMFS failed to give a "reasoned explanation" for its "departure" from the policies enunciated in Amendment 7, which added the GRAs to bluefin fishery management to minimize bycatch.  *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).  The Court disagrees.  The Bluefin Bycatch Rule did not depart from the policy pronounced in Amendment 7.  When Amendment 7 was instituted, ICCAT's rebuilding program was in place. The amendment was intended, in part, to facilitate the rebuilding of the overfished bluefin stock. At the time the Bluefin Bycatch Rule was implemented, no determination that bluefin tuna were overfished had been made.  Therefore, the Bluefin Bycatch Rule did not depart from the policy pronounced in Amendment 7 because the two rules addressed different ecological realities. Additionally, both Amendment 7 and the Bluefin Bycatch Rule were designed to keep the pelagic longline fishery within its sub-quota TAC limits but the relevant state of affairs when each rule was passed was different.  Before Amendment 7, pelagic longliners were regularly exceeding their sub-quotas, and the amendment aimed to lower their bycatch.  When the Bluefin Bycatch Rule

was implemented, pelagic longliners were not exceeding their sub-quotas as they had before Amendment 7.  NMFS therefore did not depart from the policies of Amendment 7 when it instituted the Bluefin Bycatch Rule.  Rather, Amendment 7 and the Bluefin Bycatch Rule are the agency's responses to different questions presented by two different ecological pictures.

Finally, even if plaintiffs are correct that the Bluefin Bycatch Rule is a departure from the policy pronounced in Amendment 7, NMFS supplied the necessary reasoning for any such change.  When a "new policy rests upon factual findings that contradict those which underlay its prior policy," "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Fox Television Stations, Inc.*, 556 U.S. at 515–16.  The agency provided a "reasoned explanation" for reopening the GRAs to pelagic longliners: "the overall success of the IBQ Program" indicated "that all of the measures in tandem may not [have been] necessary to appropriately limit incidental catch . . . and may not [have] best achieve[d] other management objectives."  *Id.* at 11.  In particular, "only between 9 and 18 percent of the available Gulf of Mexico IBQ allocation has been used between 2015 and 2018."  *Final Regulatory Amendment* at 171, AR 000221; *see also* ECF 24, at 12.  The agency's decision to convert the closed areas into monitoring areas therefore reflects its judgment that the extremity of Amendment 7's management measures may not be necessary to prevent overfishing.

### 2. Reducing Regulatory Redundancies

NMFS's second stated objective of the Bluefin Bycatch Rule is to "simplify and streamline" fisheries management "by reducing any redundancies in regulations."  *Bluefin Bycatch Rule*, 85 Fed. Reg. at 18,813.  Amendment 7 implemented, *at the same time*, the IBQ Program and the GRAs.  The GRAs were in place only in April and May, peak spawning and activity months for bluefin in the Gulf of Mexico, while the IBQ Program applies year-round.  Plaintiffs stress the

importance of the GRAs, and NMFS stresses the importance of the IBQ Program.  Plaintiffs allege that "NMFS's own analyses show that the Gulf GRAs have resulted in far greater reductions" in bluefin interactions than the IBQ Program alone.  ECF 18-2, at 25.  As NMFS's own environmental review found, a side-by-side comparison of the years 2012–14 and 2015–17 showed that "[i]n general, the percent reduction in total interactions, mortality, discards, and dead discards was greater in April-May than in February-March."  *Final Regulatory Amendment* at 278 (Table E.3), AR 000328.  NMFS explains this comparison is not conclusive as to the independent value of the GRAs.  *See generally id.* at 273–82 ("Appendix E: Interpretation of Monthly Data Related to Gulf of Mexico Gear Restricted Area Impacts"), AR 000323 – 000332.  The appendix identifies multiple variables for which the side-by-side comparison cannot account, notably a change in fishing effort (*i.e.*, number of hooks set) in response to Amendment 7.  *Id.* at 278, AR 000328.

The Administrative Record clearly establishes that the IBQ Program achieved significant reductions in bluefin interactions outside of April and May, the peak spawning months.  The Bluefin Bycatch Rule reopens the Gulf GRAs during April and May only for three years and subject to monitoring.  Because the GRAs and the IBQ Program were implemented in tandem, there is value in gathering data on the impact of the year-round IBQ Program without the GRAs during April and May, as NMFS asserts and intends to do.  *See Bluefin Bycatch Rule*, 85 Fed. Reg. at 18,815, AR 000004.  Under these circumstances, "the choice between reasonable policy alternatives in the face of uncertainty was the [agency's] to make."  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2570 (2019).

### 3. Optimizing the Harvest of Target Species

The third objective is the optimization of the harvest of target species in a fair manner. NMFS cites the "[c]ontinued underharvest of quotas in the associated target fisheries, particularly

the swordfish quota," to justify reopening of the designated areas to pelagic longline vessels during April and May. *Bluefin Bycatch Rule*, 85 Fed. Reg. at 18,832, AR 000021; ECF 24, at 16. There is some support for that concern in the record. For example, between 2012 and 2018, the pelagic longline fishery saw decreased revenue and effort. *Final Regulatory Amendment* at 11, AR 000061 (Table 1.1). Similarly, there has been a significant decrease in United States swordfish catch. AR000114 (Table 3.8). The record demonstrates, however, that NMFS itself predicted the annual average revenue for target species caught in April and May of 2020 through 2022 will be between $538,151 and $687,962, compared to an average of $677,007 for April and May of 2015 through 2018. *Final Regulatory Amendment* at 166 & 172, AR 000216 & 000222; *see also id.* at 166, AR 000216 ("Revenue from some species is predicted to decrease during these two months, particularly for swordfish."). How a rule that likely decreases the target-species revenue for fishing vessels helps those vessels maximize target catch is unclear.

Assuming, however, that plaintiffs have shown the facts found are not rationally related to the Bluefin Bycatch Rule's third objective, NMFS has nevertheless demonstrated a rational basis for the rule with respect to its first and second objectives. Consequently, plaintiffs have failed to show that the rule is "so contrary to the evidence so as to be arbitrary." *See Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 206 (4th Cir. 2009) (finding appellant "able to 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made'"); *cf. Roe*, 947 F.3d at 225 (finding "each explanation offered by the Government for [a] policy [was] unsupported by the record or contradicted by scientific evidence" and therefore that "the Government failed to consider the relevant evidence and offer[ed] explanations so contrary to that evidence as to be arbitrary").

### D.  Compliance with the ATCA

Alongside the MSA, the Atlantic Tunas Convention Act authorizes the Secretary of Commerce to promulgate conservation and management measures for bluefin and other tuna.  16 U.S.C. § 971d(c).  The ATCA is the domestic implementing legislation for recommendations made by ICCAT.  *Id.*  The United States is a contracting party to the International Convention for the Conservation of Atlantic Tunas, which established ICCAT, and is bound by ICCAT recommendations.  Mar. 21, 1969, 20 U.S.T. 2887, T.I.A.S. No. 6767.  The ATCA requires the administering agency to promulgate "regulations as may be necessary and appropriate to carry out" ICCAT's recommendations.  16 U.S.C. § 971d(c)(1)(A).  "[N]o regulation promulgated under" the ATCA "may have the effect of increasing or decreasing any allocation or quota of fish or fishing mortality level to the United States agreed to pursuant to a recommendation" of ICCAT. *Id.* § 971d(c)(3) (flush language).  NMFS administers the ATCA.[9]

Plaintiffs argue the Bluefin Bycatch Rule violates the ATCA for two reasons: (1) The rule authorizes a *de facto* targeted bluefin fishery for pelagic longliners in the Gulf of Mexico, in contravention of ICCAT's longstanding prohibition on targeted fishing for bluefin by pelagic longliners; and (2) The rule "has the effect of allocating a higher catch and mortality of spawning bluefin in the Gulf than the level ICCAT authorized."  ECF 18–2, at 31–33 (internal quotation marks omitted); ECF 23, at 23–26.  These arguments are unconvincing.

First, NMFS continues to prohibit directed bluefin fishing by pelagic longline vessels.  The entire longline quota category is comprised of incidental catch.  50 C.F.R. § 635.27.  This, plaintiffs argue, does not necessarily mean there is no directed fishery for bluefin.  Citing an NMFS statement from 25 years ago, plaintiffs argue that "NMFS itself noted in 1988 that allocating

---

[9] DOO 10–15 § 3.01(y) and NOAA Transmittal 61 § II(C)(14).

incidental catch quotas for bluefin in the Gulf 'may have permitted a directed fishery for Atlantic bluefin tuna in the Gulf of Mexico, contrary to the intent of the regulations and the United States' obligations' to ICCAT."  *See* ECF 18-2, at 21 (quoting Receipt of a Petition for Rulemaking; Atlantic Bluefin Tuna Fisheries, 53 Fed. Reg. 10,415 (Mar. 31, 1988), AR 019774).  Plaintiffs mischaracterize the context and meaning of that quote.  The full quote from that section reads:

> In addition, NOAA uses this opportunity to solicit comments and recommendations from all Atlantic bluefin tuna permit holders and industry members on other measures being considered. . . . These measures would: (1) Limit the incidental longline catch amount of Atlantic bluefin tuna landed from the southern part of the Regulatory Area to 2 percent by weight of all other fish on board.  Currently, vessels fishing in this area, south of 36°00' N. latitude, may retain two Atlantic bluefin tuna per trip.  This may have permitted a directed fishery for Atlantic bluefin tuna in the Gulf of Mexico, contrary to the intent of the regulations and the United States' obligation to [ICCAT]. . . .

*Id.*, AR 019774.  Thus, the agency did not state that any level of incidental catch creates a *de facto* bluefin fishery.  Rather, it stated that the permissible retention of two bluefin per trip potentially created the risk of permitting a directed fishery.  This risk has been reduced by the IBQ Program, a sophisticated individual vessel accountability system that essentially prevents a directed bluefin fishery from developing.

Second, the rule does not, as plaintiffs argue, have the effect of allocating a higher catch and mortality of spawning bluefin in the Gulf than the level authorized by ICCAT.  There is no dispute that the Bluefin Bycatch Rule does not increase the TAC allocated by ICCAT.  Nonetheless, plaintiffs contend the rule violates ICCAT's directive to "minimize dead discards to the extent practicable," because the success of the GRAs showed the extent to which dead discards can be practically reduced, and without the GRAs, dead discard minimization "to the extent practicable" is not achievable.  ECF 18–2, at 33.  It may be that the GRAs and IBQ Program, working together, reduce the possible number of dead discards, but as discussed above, possible

29

is not synonymous with practicable.  *See supra,* Section C, Part 1.  Determining whether an otherwise permissible quota minimizes dead discards "to the extent practicable" while enabling the catch of the optimum yield falls squarely with NMFS's expertise.  *See Conservation L. Found. v. Evans*, 360 F.3d 21, 28 (1st Cir. 2004) ("We think by using the term 'practicable' Congress intended rather to allow for the application of agency expertise and discretion in determining how best to manage fishery resources.").  NMFS considered that dead discards substantially decreased after the implementation of Amendment 7.  *Final Regulatory Amendment* at 26 (Fig. 3.1), AR 000724.  Because, as discussed earlier, NMFS could not determine which of Amendment 7's management tools—alone or in tandem—were responsible for the reduction in bluefin bycatch, NMFS kept the IBQ program in place, turned the GRAs into monitoring areas, and enacted a failsafe provision in the event the pelagic longline vessels' bluefin bycatch approached or reached the permitted limit.  These reasonable measures, taken in the face of uncertainty, did not have the effect of allocating a higher catch and mortality of spawning bluefin in the Gulf than the level authorized by ICCAT.

The Court finds that the Bluefin Bycatch Rule does not "have the effect of increasing or decreasing any allocation or quota of fish or fishing mortality level" recommended by ICCAT. The rule thus does not violate the ATCA.

### E.  Compliance with NEPA

The National Environmental Policy Act is meant "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005) (citing 42 U.S.C. § 4321). NEPA requires that "federal agencies must take a 'hard look' at the potential environmental consequences of their actions."  *Ohio Valley Env't Coal.*, 556 F.3d at 191; *see* 42 U.S.C. § 4332.

Taking a hard look "requires a pragmatic judgment whether the [EIS's] form, content[,] and preparation foster both informed decision-making and informed public participation." *Webster*, 685 F.3d at 421 (quoting *Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1036 (9th Cir. 2012)) (alterations in original). Agencies must account for reasonably foreseeable effects, but "they generally need not do so with effects that are merely speculative." *Webster*, 685 F.3d at 429 (citing *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1253 (10th Cir. 2011)). The Court "do[es] not 'second-guess agency decisions, so long as the agency has given a hard look at the environmental impacts of its proposed action.'" *Save Our Sound OBX, Inc. v. North Carolina Dept. of Transportation*, 914 F.3d 213, 221 (4th Cir. 2019) (quoting *Nat'l Audubon Soc'y*, 422 F.3d at 185, 199). "As long as the adverse environmental effects of a proposed action are sufficiently identified and evaluated, an agency is vested with discretion to determine under NEPA that other values outweigh the environmental costs." *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999). NEPA, therefore, "merely prohibits uninformed— rather than unwise—agency action." *Nat'l Audubon Soc'y*, 422 F.3d at 184 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)) (internal quotation marks omitted).

Plaintiffs argue NMFS violated NEPA by failing to take a hard look at the Bluefin Bycatch Rule's environmental impact on spawning bluefin tuna and other non-target species in the Gulf of Mexico and Northeastern United States areas. ECF 18-2, at 34–38; ECF 23, at 27–33. The record does not support plaintiffs' arguments.

### 1. Bluefin Tuna

Plaintiffs argue that NMFS failed to consider "how increasing catch and mortality of spawning adults on the only major spawning grounds for Western Atlantic bluefin tuna affects the population's reproductive success and thus its ability to maintain or recover to healthy levels."

ECF 18-2, at 34–35.

A review of the FEIS makes clear the agency considered the effect of the rule on spawning bluefin.  The agency instituted a failsafe provision, which would close the monitoring areas if the 114-maximum authorized bluefin were caught between April and May, guaranteeing that in no case would the Bluefin Bycatch Rule result in more than 114 caught bluefin in the Gulf monitoring area.  *See Final Regulatory Amendment* at 169, AR 000219 (Figs. 4.15 & 4.16).  In addition to guaranteeing a bycatch limit, NMFS also forecasted the total expected catch under the Bluefin Bycatch Rule.  For example, NMFS predicted 3–7 bluefin would be kept and 5–7 bluefin would be discarded in the Gulf of Mexico while the Bluefin Bycatch Rule was in effect.  *Id.* at 163 (Table 4.23), AR 000213.  While the table reflecting these predictions does not specifically identify the relevant bluefin as spawning bluefin, it clearly identifies the area—the Gulf of Mexico—and the time—April to May—a place and time plaintiffs argue is all but synonymous with spawning bluefin.  *Id.*, AR 000213.  Thus, the agency considered the effect of the rule on spawning bluefin.[10]

Plaintiffs argue that taking a hard look at the environmental consequences of its actions

---

[10] Relatedly, plaintiffs argue NMFS failed to consider the Final Rule's impact on Atlantic bluefin tuna as a species.  They assert that Western Atlantic "[b]luefin spawners in the Gulf of Mexico are vital to supporting the entire [Atlantic bluefin] species[,] . . . [that] [t]hese fish 'carry the genes and resilience necessary for spawning in the hottest waters[,] [and that] at this time of warming oceans, we need these populations with their unique cardiac abilities, heat tolerance, and large body size to succeed." ECF 18-2, at 36 (quoting Barbara Block, *Comment on the Draft Regulatory Amendment to Modify Pelagic Longline Bluefin Tuna Area-Based WeakHook Management Measures* (Sept. 30, 2019), AR 019346); ECF 23, at 30.  Fundamentally, plaintiffs are concerned with the survival and persistence of bluefin tuna.  NMFS reasonably found the Bluefin Bycatch Rule would not jeopardize the Western Atlantic bluefin population either because predicted bycatch was low or because a failsafe provision prevented bycatch in excess of the TAC.  If the Western Atlantic bluefin population is not jeopardized, it follows that the entire Atlantic bluefin population—whose survivability, plaintiffs argue, relies on the genes of the Western Atlantic bluefin—too would not be jeopardized.  Accordingly, I disagree NMFS erred in not specifically mentioning the importance of the Western Atlantic bluefin tuna's genes or resilience in sustaining the entire bluefin population.

required NMFS to analyze the total bycatch authorized under the rule (about 114), not the predicted bycatch under the rule (3–7 kept and 5–7 discarded).  The Fourth Circuit, however, has been clear that NEPA requires agencies to consider the "reasonably foreseeable" effects of the proposed action.  *Webster*, 685 F.3d at 429; *see also Dubois v. U.S. Dep't of Agriculture*, 102 F.3d 1273, 1286 (1st Cir. 1996) ("The agency need not speculate about all conceivable impacts, but it must evaluate the reasonably foreseeable significant effects of the proposed action.").  "In this context, reasonable foreseeability means that 'the impact is sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision.'"  *Dubois*, 102 F.3d at 1286 (internal citations omitted).  The predicted bycatch was a reasonably foreseeable effect of the rule that NMFS properly considered.  Plaintiffs argue the agency was required to analyze the environmental effects of the total authorized landings and discards simply because that was a possibility under the rule—however remote.  Yet, none of the caselaw plaintiffs cite for that proposition supports their expansive reading of NEPA's hard look requirement.

First, *Defenders of Wildlife v. Babbitt*, 130 F. Supp. 2d 121 (D.D.C. 2001), is readily distinguishable from the instant case.  The Court in that case considered a different statute—the Endangered Species Act—which required the defendant agencies "insure that" their activities were "not likely to jeopardize the continued existence" of the Sonoran pronghorn, an endangered species.  *Id.* at 125.  The defendants included the Secretaries and Directors of 13 departments or agencies, each of which operated in some capacity in the Sonoran pronghorn's habitat.  *Id.* at 122–23.  The defendants each considered the effects of their activities on the Sonoran pronghorn in isolation, failing to account for the cumulative effects of all their actions on the survival of the species.  *Id.* at 125.  The Court held the Endangered Species Act required a more holistic look because "[w]hile the take of one or two pronghorn as a result of a particular activity may not

jeopardize the species as a whole, the aggregate take of pronghorn resulting from each federal activity affecting pronghorn may pose such a risk." *Id.* at 130. "As incremental incidental takes are authorized, the impact of those takes on the species must be viewed in the context of previously authorized takes and other impacts that are part of the environmental baseline." *Id.*

Here, in contrast, NFMS holistically allocates and tracks the allowable catch of bluefin tuna in the Gulf and Northeast areas. Each take, actual or authorized, is in the context of a larger scheme that balances competing interests and fishing methods. Unlike in *Defenders of Wildlife*, where no one agency had to consider the overall effect of the sum of several actions, here NMFS has developed a program—the IBQ program—which considers just that. *Defenders of Wildlife* has no applicability here because NMFS is operating all its programs within the TAC permitted by ICCAT and considers the sum of all fishing efforts.

Similarly, plaintiffs' reliance on *Conservation Council for Hawaii v. National Marine Fisheries Service*, 97 F. Supp. 3d 1210 (D. Haw. 2015), is misplaced. Although the court in that case stated that "*authorized* take . . . must be evaluated in determining whether there will be only a negligible impact," the court was analyzing a different statute—the Marine Mammal Protection Act—which specifically required analysis of "the total of such taking." *Id.* at 1221 (quoting 16 U.S.C. § 1371(a)(5)(A)(i)) (emphasis in original). The Marine Mammal Protection Act has no applicability to the taking of bluefin tuna, and plaintiffs have not identified analogous language in NEPA or the MSA, the parallel statute to evaluate in this context.

Finally, *Oceana, Inc. v. Ross*, 483 F. Supp. 3d 764 (N.D. Ca. 2020), does not suggest the Court should require NMFS to take a hard look at the impact of catching 114 spawning bluefin in this case. In *Oceana*, the court did not consider whether NMFS complied with NEPA. Rather, it considered a challenge under the MSA to a regulation that dealt with the northern anchovy—a

34

"relatively short-lived" fish with "populations [that] tend to fluctuate over time." *Id.* at 770. The agency based its decision on data from three years in which the anchovy population was rapidly increasing, and the agency did not account for the known anchovy population fluctuations. *Id.* at 784. Thus, the agency likely underestimated the impact the allowable catch would have on the population because it did not account for the foreseeable population fluctuations. *Id.* Further, the agency set the "limit for an indefinite period of time without a mechanism to respond to significant changes in anchovy abundance" despite the known, extreme fluctuations in the anchovy population. *Id.* In addition to the fact that the court in *Oceana* was deciding an altogether different question—whether the agency complied with the MSA's National Standard One—here the agency has implemented a three-year test pilot with a failsafe provision. Thus, *Oceana* is neither on point nor persuasive in this case.

In summary, NMFS took a sufficiently hard look at the potential environmental consequences of the Bluefin Bycatch Rule on bluefin.

### 2. Other Species

NMFS has satisfied its procedural duty under NEPA by taking a "hard look" at the effect of the Bluefin Bycatch Rule on other nontarget species. NMFS expressly considered the impact on nontarget species in the Final Environmental Impact Statement:

> Under Preferred Alternative A4 [that deals with the Northeastern United States Closed Area,] the predicted total annual discards of spearfish and dusky shark, and interactions with sea turtles, were less than predicted discards or interactions under the No Action Alternative. This suggests that the ecological impacts to spearfish, dusky shark, and sea turtles are anticipated to be more beneficial under the Preferred Alternative than under the No Action Alternative due to predicted redistribution away from areas with high [catch per unit effort]. The predicted annual interactions of shortfin mako and discards of white and blue marlin, and sailfish, under the preferred alternative were calculated to be similar to the No Action Alternative, interactions or discards associated with the No Action Alternative fell within the range of predicted total annual interactions or discards that might occur under preferred Alternative A4, suggesting that the ecological

> impacts would also be similar for these species. Under Preferred Alternative C3, the predicted total annual interactions with shortfin mako and discards of dusky sharks was calculated to be less than the current annual interactions and discards of these species in open areas of the Gulf of Mexico. This suggests that the ecological impacts to shortfin mako and dusky shark are predicted to be more beneficial under Preferred Alternative C3 than the No Action Alternative, due to predicted redistribution away from areas with high CPUE. The predicted annual sea turtle interactions, and discards of blue and white marlin and sailfish, were similar between the No Action Alternative and Preferred Alternative C3, suggesting comparable ecological impacts across the two alternatives for these species.

*Final Regulatory Amendment* at 286–87, AR 000336–37. This analysis is supported with data

expressed in two tables, which reflect NMFS' expected interactions between pelagic longliners

and nontarget species in the formerly closed areas. *Id.* at 125 & 165, AR 000175 & 000215 (Tables

4.10 & 4.24). Plaintiffs do not address this consideration of the impact on other nontarget species.

Nor do plaintiffs address the fact that converting the GRAs into monitoring areas may not impact

other nontarget species in the same way it may impact bluefin, because nontarget species, unlike

bluefin, do not gather to spawn in the monitoring areas. Indeed, plaintiffs posit that "the fish the

Gulf GRAs save from being caught and killed are all spawning bluefin." ECF 18-2, at 25.

NMFS provided additional explanation for its conclusion that the majority of nontarget

species would experience net-neutral effects from the Bluefin Bycatch Rule. For example, NMFS

identified six different subspecies of turtle as "ESA-listed species within the action area for this

action and with which the [highly migratory species] fisheries that are the subject of this interaction

may interact." *Final Regulatory Amendment* at 97, AR 000147. The agency further identified the

status of each of those subspecies, identifying each as endangered, threatened, or both. *Id.*, AR

000147. NMFS then went on to identify management measures put into place to mitigate the effect

of the pelagic longline fishery on sea turtles, including requiring the use of mitigation gear,

requiring that vessels carry clippers and dipnets, and regulating certain bait and safe handling

procedures for pelagic vessels. *Id.* at 98, AR 000148. Significantly, "NMFS monitors observed

interactions with sea turtles . . . on a quarterly basis and reviews data for additional appropriate action, as necessary." *Id.* at 99, AR 000149.

The agency likewise considered the interactions between pelagic longliners and essential fish habitat. NMFS found that "[m]ost [highly migratory species] reside in the upper part of the water column." *Final Regulatory Amendment* at 49, AR 000099. Analyses undertaken "determined that the majority of [highly migratory species] gears are fished within the water column and do not make contact with the sea floor." *Id.*, AR 000099. The agency found that "deployment of pelagic longline gear is not anticipated to permanently affect the physical characteristics that define [highly migratory species' essential fish habitat] such as salinity, temperature, dissolved oxygen, and depth." *Id.* at 49–50, AR 000100–01. And, "[b]ecause pelagic longline gear is fished in the water column and does not come in contact with the benthic environment [the lowest ecological zone in a body of water], the pelagic longline fishery is anticipated to have minimal to no impact on the [essential fish habitat] (for Atlantic [highly migratory species] or for other species managed under Council [fishery management plans])." *Id.* at 50, AR 000100. Plaintiffs do not acknowledge this analysis or make any argument as to why the analysis is incomplete. The Court does not "second-guess" agency decisions where the agency has given a hard look at the problem, especially where the plaintiffs have failed to raise any specific argument against the agency's evaluation. *See Save Our Sound*, 914 F.3d at 221.

As a final example, the Final Environmental Impact Statement contains discussion of the impact of the Final Rule on seabirds. NMFS noted that "[t]he majority of longline interactions with seabirds occur as the gear is being set." *Final Regulatory Amendment* at 100, AR 000150. The agency observed that the bycatch of this species is low: Of 5.3 million hooks set in 2017, only seven seabirds were taken, five seabirds were released dead, and two seabirds were released alive.

*Id.*, AR 000150. Plaintiffs appear to argue that the Department of the Interior's public comment on reductions of protection for seabirds under the Bird Treaty Act required NMFS to explicate more fully its analysis of the impact on seabirds. *See* U.S. Dep't of the Interior, Office of Environmental Policy and Compliance, *Re: Comments on the Draft Environmental Impact Statement (DEIS) Draft Regulatory Amendment to Modify Pelagic Longline Bluefish Tuna Area-Based and Weak Hook Management* Measures (Sept. 30, 2019), AR 019541–42. The Court does not agree. "Although an agency should consider comments of other agencies, it does not necessarily have to defer to them when it disagrees." *Hughes River*, 165 F.3d at 288. Here, NMFS analyzed the recent historical interaction between longliners and seabirds and found it minimal. NMFS satisfied its duty under NEPA to identify the effects of its proposed action.

Because NMFS took a hard look at the environmental effects of the Bluefin Bycatch Rule on bluefin spawners and non-bluefin, nontarget species, plaintiffs' NEPA challenge fails.

### F. Notice and Comment Requirements under the APA

Plaintiffs also argue NMFS inappropriately invoked the APA's "good cause" exception, 5 U.S.C. § 553(d)(3), for making the Bluefin Bycatch Rule effective on the same day it was promulgated. ECF 18-2, at 38–41. NMFS counters that, because the Bluefin Bycatch Rule was deregulatory, 5 U.S.C. § 553(d)(1) automatically permitted the same-day promulgation and implementation of the Final Rule. ECF 21-2, at 35; *see* 5 U.S.C. § 553(d)(1) ("The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—(1) a substantive rule which grants or recognizes an exemption or relieves a restriction[.]"). NMFS additionally challenges plaintiffs' Article III standing to bring a claim based on the agency's purported invocation of the APA's good cause exception. ECF 21-2, at 34 & n.26. Plaintiffs did not respond to the standing argument raised by NMFS, and they did not

expound upon their argument about the applicability of the APA's good cause exception.  *See* ECF 23.

"Standing 'is a threshold jurisdictional question' that ensures a suit is 'appropriate for the exercise of the [federal] courts' judicial powers.'"  *Dreher v. Experian Information Solutions, Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998))) (alterations in original). Plaintiffs "carry the burden of demonstrating each element of standing."  *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 188 (4th Cir. 2018).  Plaintiffs have not established they possess standing to challenge the agency's compliance with 5 U.S.C. § 553(d).  Accordingly, Count VI is dismissed.

A separate Order shall issue.

Date: March 11, 2022

Deborah L. Boardman
United States District Judge